**SOUTH EAST LAKE VIEW NEIGH-BORS, et al., Plaintiffs-Appellants,**

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., Defendants-Appellees,**

**Sheldon Baskin, et al., Intervening Defendants-Appellees.**

**No. 81–2104.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1981.

Decided July 28, 1982.

Lawrence P. Bemis, Kirkland & Ellis, Chicago, Ill., for plaintiffs-appellants.

Dan K. Webb, U. S. Atty., Frederick H. Branding, Asst. U. S. Atty., Chief, Civil Division, Mary S. Rigdon and Edward J. Moran, Asst. U. S. Attys., Chicago, Ill., for defendants-appellees.

Jack M. Siegel, Chicago, Ill., for intervening defendants-appellees.

Before WOOD and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Two non-profit associations and four individual plaintiffs appeal the district court's dismissal of their action against the Department of Housing and Urban Development ("HUD") and several agency officials. The

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

South East Lake View Association and the Park West Community Association, two neighborhood associations devoted to promoting the quality of life in the Broadway-Diversey area in the City of Chicago and Richard Means, Cheryl Raff, Clara Goldman, and Evelyn Caldwell, all residents of the neighborhood, brought suit against HUD to halt federal funding of the Broadway-Diversey building project. After the plaintiffs filed the action, the project developers and several prospective tenants, given preferential status because they had lived in the old Rienzi Hotel demolished to make way for the Broadway-Diversey building, intervened as defendants.[1]

Plaintiffs alleged HUD processed the request for federal funding under the wrong regulations and did not file the environmental impact statement required by 42 U.S.C. § 4332(2)(C). The plaintiffs alleged that construction and occupation of the building, an apartment complex for low income, handicapped, or elderly residents, would lead to increased noise and air pollution, heightened risks of crime and injury, increased crowding and congestion, and enlarged traffic and parking difficulties. Although the plaintiffs filed this action before construction began on the building, the district court did not decide HUD's motion to dismiss until after construction was virtually complete, nearly one year later. The district court held the plaintiffs lacked standing and dismissed the suit because, with the building virtually complete and soon to be occupied, no judicial relief would redress the plaintiff's injuries. We affirm.

### I. Background

#### A. The Broadway-Diversey Building And Neighborhood

The Broadway-Diversey building is a seventeen-story, 249-unit apartment building standing at the corner of Diversey Street and Broadway Street in Chicago. The building was constructed with HUD's promise to subsidize rents and with the developer's guarantee that of the 249 units, 147 would be occupied by low income families with children or by handicapped or elderly residents. Under the agreement, the remaining 102 apartments, forty percent of the building's total, would be rented at prevailing market rates.

The Illinois Housing Development Authority filed the initial application requesting HUD to reserve funds for subsidizing rents in the building. Section 201(a) of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f ("Section 8"), authorizes HUD to contract with state housing agencies and commit federal funds to subsidize rents in privately owned apartment buildings catering to low income tenants. *Holbrook v. Pitt*, 643 F.2d 1261, 1266–67 (7th Cir. 1981). Under Section 8, tenants receive federal subsidies so no resident pays more than twenty-five percent of his net income in rent. Those subsidies are paid directly to the building owner. HUD also guaranteed the building's mortgage pursuant to Section 221(d)(4) of the National Housing Act of 1934, 12 U.S.C. § 1715*l*, and the Government National Mortgage Association eventually purchased it under Title III of the National Housing Act of 1934, 12 U.S.C. §§ 1716 *et seq.*

The building stands on a site which the plaintiffs allege is notorious for its violent crime and sordid atmosphere. They claim male and female prostitution is prevalent, a methadone drug rehabilitation clinic is located within a block of the building, and that the site, the frequent scene of illegal narcotics transactions, commands and receives extraordinary police protection. They also allege that the building stands in an area among the most congested in the country: it holds between 82,000 and 100,000 inhabitants per square mile, and over 40,000 automobiles and 12,000 pedestrians pass through the Broadway-Diversey intersection daily.

---

1. This is the plaintiffs' second appeal before this court. We considered their first appeal, an appeal from the district court's decision denying their motion for a temporary injunction staying release of Section 8 funding to the project, in an unpublished order, *South East Lake View Neighbors Ass'n v. HUD*, 654 F.2d 725 (7th Cir. 1981).

The plaintiffs first sought to stop federal participation in construction of the apartment building in mid-summer 1980, when they filed their original complaint in this action. They filed the complaint one year after the Illinois Housing Development Authority applied to HUD to reserve Section 8 funds for the project and one month after existing structures were razed. In September, 1980, HUD gave final approval for federal rent assistance and mortgage insurance, and building construction began. At the same time, HUD moved to dismiss this action for the plaintiffs' lack of standing to sue. In response to the motion, the plaintiffs amended their complaint, adding neighbors Evelyn Caldwell and Clara Goldman as plaintiffs.

### B. *The Complaint*

Under HUD regulations, Section 8 rental assistance is available for three types of housing: new construction, rehabilitated existing structures, and already existing structures. If a structure is inhabitable, HUD may enter into a long term commitment to provide federal rent supplements for low income tenants meeting eligibility criteria. The Broadway-Diversey complex is new construction, and if HUD's commitment withstands the challenge of this lawsuit, the agency will pay approximately $20 million in rent supplements to the building owners over the next two decades.

The plaintiffs allege HUD approved Section 8 funding under the wrong regulations and argue that, as a result, the Broadway-Diversey area does not satisfy the site and neighborhood standards which condition the allocation of Section 8 funds under HUD regulations.[2] HUD and state housing agencies divide responsibilities for processing applications for Section 8 funding. The state agency processes applications exclusively requesting Section 8 funding. It examines those applications under the "fast tract" regulations, 24 C.F.R. §§ 883 *et seq.* (1979), where HUD plays only a supervisory role. On the other hand, HUD processes applications requesting both Section 8 funding and federal mortgage insurance under the agency's "slow track" regulations, 24 C.F.R. §§ 880 *et seq.*, where it gives the proposal closer scrutiny. While the Broadway-Diversey funding request did not initially seek federal mortgage insurance, the plaintiffs contend that once the Illinois Housing Development authority added the request to the application, slow track regulations governed. The plaintiffs have alleged that HUD regulations required the federal agency to process the Broadway-Diversey funding application itself and if the regulations had been followed the building would have failed the site and location test. The regulation at issue, 24 C.F.R. § 880.112, essentially requires HUD to examine a neighborhood for its safety, sanitation, racial concentration, and social, recreational, and employment resources before committing federal funds to the building and offering low income tenants the opportunity to reside there at subsidized rents. Plaintiffs, therefore, contend that Section 8 funding to the project is an illegal expenditure of funds. They ask the district court to enjoin Section 8 funding, invalidate the federal mortgage insurance, and rescind the purchase of the mortgage.

The plaintiffs also alleged HUD did not file an environmental impact statement under Section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C) ("NEPA"), before approving the application.[3] Rather than prepare a

---

2. An apartment complex must satisfy the site and location standards embodied in 24 C.F.R. § 880.112 (1979) if HUD reviews the application and 24 C.F.R. § 883.309 if the state housing agency processes it in order to qualify for Section 8 funding.

3. 42 U.S.C. § 4332(2)(C) states in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible... (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

full environmental impact statement, HUD issued a special environmental clearance under its own regulations, 24 C.F.R. §§ 50 *et seq.* An environmental clearance is an abbreviated inquiry undertaken after HUD concludes its actions are too minor to justify an exhaustive environmental study. HUD concluded in the environmental clearance that the project would not damage the neighborhood. Contending the environmental clearance was inadequate, the plaintiffs alleged, first, that subsidizing the building was a major federal action requiring full environmental study under 42 U.S.C. § 4332(2)(C) and second, that despite the express directives of 42 U.S.C. § 4332(2)(C)(iii), alternatives to the site were not considered before HUD approved funding. The plaintiffs again asked the district court to enjoin Section 8 funding.

Finally, the plaintiffs sought to enjoin HUD from insuring advances on the building mortgage and the Government National Mortgage Association from purchasing it. The plaintiffs' possible success on these two counts rests on the building's eligibility for Section 8 funding. The National Housing Act of 1934, 12 U.S.C. § 1715*l*(b), allowed HUD to insure advances on mortgages for new construction eligible for Section 8 funding. However, the Illinois Housing Development Authority applied for federal mortgage insurance only after it became clear that the project could not qualify for advantageous tax treatment under the original plan. Filed in August, 1979, the amended application was approved in September, 1980 when HUD insured the mortgage for $16.8 million over the next forty years. The plaintiffs allege that since the project was ineligible for Section 8 funding, the mortgage insurance agreement is also null. The allegations over the mortgage purchase are similar. The plaintiffs contend that the mortgage purchase agree-

ment, also contingent on the Section 8 eligibility, is also invalid.

In summary, the plaintiffs challenged HUD's decision on two grounds. They alleged first that HUD approved the request, under inapplicable regulations, with the result that the project would have failed the site and location test under the correct regulations, and second that the agency reached its decision without thoroughly considering the building's effect on the neighborhood environment. Both failures, the plaintiffs alleged, caused their injuries. To remedy these injuries, they asked the district court to enjoin federal funding of the project.

### C. *The Plaintiffs*

██ The South East Lake View Neighbors Association and the Park West Community Association are community organizations composed of individuals living near the Broadway-Diversey apartment building. The Broadway-Diversey building stands on the boundary between the two associations. Both organizations hold the general goal of improving the quality of life for members in the neighborhoods they represent. Since neither association alleged a direct injury to itself, each is a party only to represent individual members, like plaintiffs Richard Means and Cheryl Raff, allegedly harmed by HUD's actions. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

Richard Means has lived 1200 feet from the Broadway-Diversey apartment building site since 1978; Cheryl Raff has lived 200 feet from the site for eight years. Both walk or drive through the Broadway-Diversey intersection three or four times weekly. For both, the increased population density will allegedly create additional crowding

---

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the

maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

and pollution, strain the neighborhood's limited social and recreational resources, and generally add many small irritations which naturally flow from an increase in congestion in a confined urban area.

The other plaintiffs, Evelyn Caldwell and Clara Goldman, are elderly women living alone in the neighborhood. They claim standing to sue as residents of the neighborhood and as potential residents of the building. Like Raff and Means, both frequently travel past the site and claim the building and the attendant congestion will hinder that activity. Unlike Means and Raff, they may reside in the Broadway-Diversey building in the future. Both are eligible, because of their age and low income status, for Section 8 rental assistance. Caldwell already receives Section 8 benefits and Goldman is on a waiting list to receive them. Although neither has applied to live in the building, they allege that a high rise elevator building in the Broadway-Diversey area leaves them vulnerable, should they ever choose to reside there, to criminal attack.[4]

## II. The Law of Standing

■ Over the last decade, the Supreme Court has modified the legal principles embraced by the standing doctrine. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). A plaintiff invoking the power of the federal courts must allege a "discrete and palpable" injury, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and show that the interests the plaintiff seeks to protect arguably fall within the zone of interests Congress meant to protect by enacting the statute, *Camp*, 397 U.S. at 156, 90 S.Ct. at 831. Respectively, these requirements represent the constitutional and prudential dimensions to the doctrine of standing.[5]

■ The constitutional limitation derives from Article III, which requires an actual "case or controversy" between litigants before the power of the federal judiciary may be invoked to resolve a dispute. *Id.* at 151, 90 S.Ct. at 829. Concisely stated, a plaintiff who "has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction, and to justify exercise of the court's remedial powers on his behalf," *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205, quoting *Baker v. Carr*, 369 U.S. 186, 201, 82 S.Ct. 691, 701, 7 L.Ed.2d 663 (1962) (emphasis in original), has alleged an injury satisfying the constitutional dimension of the standing doctrine. Allegations in the complaint of (1) a bona fide injury which, however small, negates all implication that the plaintiff filed the lawsuit from intellectual or academic curiosity, *United States v. SCRAP*, 412 U.S. 669, 687–88, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), and (2) a "fairly traceable" causal connection between the plaintiff's alleged injuries and the defendant's illegal conduct, *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), establish that the plaintiff has suffered injury at the hands of the defendant and confirm that he holds the requisite personal stake to prosecute the lawsuit. Otherwise judicial intervention could be a fruitless, gratuitous endeavor.

---

**4.** 42 U.S.C. § 1437f(c)(1) prohibits HUD from subsidizing "high rise elevator projects for families with children unless there is no practical alternative." The plaintiffs also alleged in their amended complaint that HUD ignored this restriction in allocating Section 8 funding to the building.

**5.** The plaintiffs find standing in section 10 of the Administrative Procedure Act, 5 U.S.C. § 702, which provides:

A person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Though section 10 is a general grant of standing to all persons "adversely affected or aggrieved" by agency action, that provision did not loosen the restrictions of the standing doctrine. The requirements that a plaintiff show injury and fall within the statutory zone of interests remain intact. *United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).

■ In addition to alleging an actual case or controversy, plaintiffs must have interests arguably falling within the zone of interests Congress meant to protect by passing the statute. *SCRAP*, 412 U.S. at 686, 93 S.Ct. at 2415. The zone of interests limitation is one of several non-constitutional, judicially-imposed, prudential restrictions on the exercise of federal judicial power. *See, e.g., Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974); *United States v. Raines*, 362 U.S. 17, 22–23, 80 S.Ct. 519, 523–524, 4 L.Ed.2d 524 (1960). The limitation derives from the conviction that it is imprudent in some circumstances for the courts to exercise power, even though a plaintiff established an actual case or controversy in his complaint. The restriction is founded upon a concern for the "proper—and properly limited—role of the courts in a democratic society." *Warth*, 422 U.S. at 498, 95 S.Ct. at 2205. However, despite the self-imposed nature of the limitation, its application is not discretionary with the district court. *Peoples Gas, Light & Coke Co. v. United States Postal Service*, 658 F.2d 1182 (7th Cir. 1981). Congress may abolish the limitation entirely, *Camp*, 397 U.S. at 154, 90 S.Ct. at 830, or suspend its application to a particular statute, *Havens Realty Corp. v. Coleman*, —— U.S. —— at ——, 102 S.Ct. 1114 at 1121, 71 L.Ed.2d 214 (1982), but the courts may not override the limitation simply by deciding to observe it.

■ Finally, a challenge to standing does not justify an inquiry into the strength of a complaint. Questions of standing deal exclusively with whether the plaintiff alleged facts satisfying the constitutional and prudential limitations of the doctrine. The ability of the complaint on its merits to survive a summary judgment motion or support an award in law or equity after a full trial is irrelevant. *Camp*, 397 U.S. at 153, 90 S.Ct. at 829; *Barlow v. Collins*, 397 U.S. 159, 168, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting). The proper focus is upon the plaintiff and whether his interest in the controversy is significant enough to justify the exercise of federal judicial power on his behalf. *Simon*, 426 U.S. at 38, 96 S.Ct. at 1924; *Warth*, 422 U.S. at 498–99, 95 S.Ct. at 2204–05; *Sierra Club*, 405 U.S. at 734–35, 92 S.Ct. at 1365–66. Consequently, the district court considering a motion to dismiss for lack of standing accepts all material allegations in the complaint as true and liberally construes the document in favor of the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969).

### III. Injury in Fact

■ The plaintiffs allege a series of injuries to their neighborhood from the decision to provide Section 8 funding. They contend that once the building is occupied, increases in traffic and parking congestion, noise and air pollution, and population density and violent crime will inevitably follow. These allegations clearly satisfy the injury in fact test of the standing doctrine. The alleged injuries are virtually identical to those conferring standing to sue upon a group of local residents in *Coalition for the Environment v. Volpe*, 504 F.2d 156 (8th Cir. 1974). In *Volpe*, the court found allegations of "an increase in automobile traffic (and consequent traffic jams and delay in travel), general crowding and attendant increases in air and noise pollution" were "more than simple assertions of distaste or displeasure; they were statements of specific injury experienced by ascertainable individuals who reside near or pass through the affected area." *Id.* at 167.[6] In addition, despite the

---

6. Plaintiffs Goldman and Caldwell challenged HUD's decision as potential residents of the complex as well as residents of the surrounding neighborhood. Neither plaintiff, however, has applied to live in the building or expressed a future intention to do so. These plaintiffs lack standing to sue as potential residents of the complex because they have not shown the req-

uisite injury in fact. While it is possible the women will someday live in the building, it is also possible that they will not. Since the plaintiffs have not shown that they will suffer the ill effects of HUD's failure to comply with its site and location regulations and the ban on the construction of highrise elevator projects under 42 U.S.C. § 1437f(c)(1), they lack stand-

defendants' arguments to the contrary, the injuries were not too small, speculative, or dispersed to pass Article III muster. Even allegations of a small increase in the already severe urban problems of the area satisfied the injury in fact test. In *SCRAP*, five plaintiffs alleged the Interstate Commerce Commission's failure to consider the environmental consequences of approving a slight increase in freight hauling rates for railroads led to an increase in the relative costs of new, as opposed to recycled, materials which led in turn to a miniscule increase in air and water pollution in national parks which the plaintiffs used. The Supreme Court found that, however slight their injuries, the plaintiffs had standing to sue. `

The Government urges us to limit standing to those who have been "significantly" affected by the agency action. But even, if we could begin to define what such a test would mean, we think it fundamentally misconceived. "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax. As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing. . . ."

*SCRAP*, 412 U.S. at 689 n.14, 93 S.Ct. 2417 n.14 (citations omitted).

▆▆ Nor were the plaintiffs' injuries too speculative to support their standing. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). It was not speculative that once the building is fully occupied the plaintiffs' predictions of noise, pollution, congestion, and crowding could prove true. These events may plausibly

occur, and the district court assumed these problems would remain regardless of the outcome of the lawsuit. The plaintiffs' injuries are speculative, only to the extent they are small, so small that most people in an identical position would assume they flow from life in a large city and try to ignore it. *See, e.g., Rental Housing Association of Greater Lynn, Inc. v. Hills*, 548 F.2d 388, 390 (1st Cir. 1977); *San Francisco Tomorrow v. Romney*, 472 F.2d 1021, 1024 (9th Cir. 1973).

▆▆ Finally, the plaintiffs do not lose standing merely by belonging to a large or widespread group of individuals, each suffering the same small injury from HUD's actions. The Supreme Court created a special prudential limitation upon injuries amounting to a generalized grievance common to all or a large class of citizens in equal measure. *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205; *Duke Power*, 438 U.S. at 80, 98 S.Ct. at 2634. That the limitation does not apply here is evident from the narrow geographic location of the injuries and from the tenor of other decisions like *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), where a group of citizens lacked standing to challenge presidential authority to conduct the Vietnam War because nearly all citizens in the nation shared the same injury. The increased congestion, pollution, crime and population density are restricted to a single neighborhood in Chicago. Those living in the area or regularly traveling through it will suffer disproportionately from any dislocations the Broadway-Diversey building may cause. The alleged injuries are not common to citizens of Chicago generally, much less to others living beyond the city. In *SCRAP*, the Court held the plaintiffs did not lack standing to challenge administrative action solely because many others suffered the same environmental injuries.

ing to sue as potential residents of the complex. *See Warth v. Seldin*, 422 U.S. 494, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426

U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

In interpreting "injury in fact" we made it clear that standing was not confined to those who could show "economic harm," although both *Data Processing* and *Barlow* had involved that kind of injury. Nor, we said, could the fact that many persons shared the same injury be sufficient reason to disqualify from seeking review of an agency's action any person who had in fact suffered injury. Rather, we explained: "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process." *Id.*, at 734 [92 S.Ct., at 1366]. Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those resources suffered the same harm, deprives them of standing.

*SCRAP*, 412 U.S. at 686–87, 93 S.Ct. at 2415–16; *see also Havens Realty Corp.*, —— U.S. at ——, 102 S.Ct. at 1122.

Therefore, contending HUD's action will aggravate the general urban ills from which they already suffer, the plaintiffs alleged an injury in fact and, in part, met Article III standards.

**IV. Causal Connection and Redressability**

 Standing to sue, however, also depends on the existence of a fairly traceable causal connection between the defendant's allegedly illegal conduct and the plaintiff's purported injuries. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 261, 92 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). In a brief, conclusory fashion the plaintiffs alleged that allocating Section 8 funding to the project caused their injury. Implicit in the allegation is the contention that HUD's promise of funding induced construction of the structure whose inhabitation created the congestion. The defendants argue that this connection between HUD's funding decision and the congestion

causing the plaintiffs' injuries is too tenuous to support standing. Though standing is not necessarily lost because of the weakness of the causal connection, *Warth*, 422 U.S. at 505, 95 S.Ct. at 2208, a nexus sufficiently strong must be present to assure the district court that granting relief will personally benefit the plaintiffs. *Duke Power*, 438 U.S. at 74, 98 S.Ct. at 2630. The district court found it could not provide effective relief with construction nearly completed and the building in place. The court reasoned that occupation of the building was inevitable and the requested relief, the permanent injunction of federal funding, could not alter that result. The court concluded that should the plaintiffs' injuries occur, judicial relief would not redress them. *Warth* and *Simon*, two cases pertinent to but not dispositive of this issue, represent the major analyses by the Supreme Court of the causation element in the standing doctrine.

In *Simon* the Court held the plaintiffs, a group of indigents, lacked standing to challenge a change in Internal Revenue Service treatment of hospitals which did not provide free non-emergency medical services to the poor. The plaintiffs alleged the change, which gave the hospitals non-profit tax status, seriously impaired their ability to find medical treatment. The Court held an insufficient causal connection existed between the injury and the new IRS rule because changes in hospital policy toward the treatment of indigents could result from business rather than tax considerations. The Court reasoned the change was equally likely to result from business considerations because free treatment of the poor seriously drained hospital resources. In contrast, the Court noted statistics that private donors, to whom a hospital's tax status would be extremely important, accounted for a minor percentage of hospital revenues. The Court held that as the contention that hospitals would treat fewer indigents because of the changed tax rules was unsupported and purely speculative, the plaintiffs lacked standing to sue. In *Warth* the plaintiffs, also of low income status, lacked standing to challenge a mu-

nicipal zoning ordinance which they alleged unconstitutionally prevented them from living in Penfield, New York. The Court also held the causal connection between the injury and the illegal ordinance was too speculative to support standing. The Court found the exclusion of the plaintiffs was as likely to have resulted from the economics of the area housing market, which prevented low income people from finding and purchasing houses in Penfield, as from the zoning ordinance.

Unlike *Warth* and *Simon*, there is not a competing cause of the plaintiffs' injuries here. If the injuries occur, they will result from a single cause, the increased congestion in the neighborhood created by the construction and inhabitation of the Broadway-Diversey building.[7] However, this does not leave *Warth* and *Simon* irrelevant to the present case. Those cases articulate the fundamental principle behind the standing doctrine and the principle on which this case rests.

> [W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.

\* \* \* \* \* \*

The necessity that the plaintiff who seeks to invoke judicial power stands to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies.

*Simon*, 426 U.S. at 38–39, 96 S.Ct. at 1924–1925.

■■■ The relief plaintiffs seek is valueless at this late stage of proceedings. The plaintiffs requested the permanent injunction of federal assistance to the project. They asked the district court to enjoin payment of Section 8 funds, guarantees on advances on the mortgage, and the purchase of the mortgage. Though the complaint was filed soon after construction began, the building is now almost complete. We agree with the district court's conclusion that the plaintiffs' injuries are inevitable because the building will be occupied regardless of the outcome of this lawsuit.

First, only sixty percent of the building's occupants will receive Section 8 assistance. The remaining forty percent will pay free market rents which the plaintiffs estimated at the temporary injunction hearing could exceed $600 monthly. That the free market rents have reached this height indicates many people are willing to pay enormous

---

7. At the outset of the lawsuit, the complaint alleged a "fairly traceable causal connection" between the plaintiffs' environmental injury and HUD's decision to allocate Section 8 funds to the project. The chain of causation paralleled that conferring standing in *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 77–78, 98 S.Ct. 2620, 2632–2633, 57 L.Ed.2d 595 (1978). In *Duke Power* the Supreme Court held two environmental organizations and forty local residents living near the McGuire and Catawba nuclear power plants had standing to challenge the constitutionality of the Price-Anderson Act, which limited the civil tort liability of power plant owners for a nuclear catastrophe. The Court premised its decision on allegations that the Act was intended to stimulate construction of nuclear power plants and that because of the construction of the two plants, plaintiffs experienced slight increases in local radiation levels and lake water temperatures, and a threatened decline in property values.

Here the promise of Section 8 funding had a similar effect. HUD's promise induced construction of the Broadway-Diversey building whose occupation will allegedly produce the increased congestion, crime, pollution, and population density injuring the plaintiffs. Federal financial incentives in *Duke Power* and the immediate case induced private investment and the construction of the controversial building. From the building's operation, inhabitants of the surrounding neighborhood suffered a series of small intrusions on their ability to live comfortably in the neighborhood. In that light, *Duke Power* holds that when federal action directly reduces the risks which an entrepreneur must take, the causal relation between the federal guarantees and the externalities produced by the investor's actions are not too remote to support an injured third party's standing to sue. See *Simon*, 426 U.S. at 61–62, 96 S.Ct. at 1935–1936 (Brennan, J., concurring); see also *Havens Realty Corp. v. Coleman*, —— U.S. ——, ——, 102 S.Ct. 1114, 1122, 71 L.Ed.2d 214 (1982).

rents to live in a building similar to the Broadway-Diversey. In addition, the developers claimed at oral argument to have received private commitments of financing if the district court enjoins federal assistance to the project. It therefore appears that with or without federal financing, the completed building will be occupied and the attendant congestion inevitable.

The plaintiffs contend that the district court can redress their injuries by enjoining funding. Their argument, that the building, though near completion, will stand vacant and unfinished if funding is withdrawn, is unfounded. As the single ground supporting this contention, the plaintiffs rely on the developers' statement in their petition to intervene that the building could not be constructed without federal assistance. Since the developers intervened soon after the lawsuit began, the statement is of little relevance to their present financial ability to withstand the withdrawal of federal financial assistance. The plaintiffs' reliance on *Welton v. Forty East Oak Street Building Corp.*, 70 F.2d 377 (7th Cir.), *cert. denied*, 293 U.S. 590, 55 S.Ct. 105, 79 L.Ed. 685 (1934) and *J. Weingarten, Inc. v. Northgate Mall*, 390 So.2d 527 (La.App.1980), two cases holding that equity courts will halt construction on or order removal of illegally constructed buildings, is also misplaced. Neither case addresses the issue of whether the relief the plaintiffs requested, the injunction of federal funding, will provide the tangible personal benefits necessary to give them standing to continue this lawsuit. Thus, despite the plaintiffs' burden of proving standing through the pleadings and, if necessary, through affidavits or at an evidentiary hearing, *Simon*, 426 U.S. at 52–53, 96 S.Ct. at 1930–1931 (Brennan, J., concur-

ring), the record is barren of any evidence contradicting the district court's very sensible conclusion that a nearly completed apartment building will be finished and occupied.

 The plaintiffs' standing under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, deserves brief but separate attention.[8] The National Environmental Policy Act, while providing "significant substantive goals for the nation," *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), created only procedural rights for individuals living in an area affected by federal action, *Aberdeen & Rockfish Railroad Co. v. SCRAP*, 422 U.S. 289, 315, 95 S.Ct. 2336, 2353, 45 L.Ed.2d 191 (1975). The Act required agencies to file an environmental impact statement before undertaking "major federal actions." 42 U.S.C. § 4332(2)(C). The environmental impact statement is the "outward sign that environmental values and consequences have been considered during the planning stage of agency actions." *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 138, ——, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981). The Act, however, did not confer a right on individuals to be free of environmental damage. *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980). Affected residents have only a procedural right to have their interests considered in the agency decision-making process before a final decision is reached. Alleging that HUD failed to file an environmental impact statement, plaintiffs sought to enjoin funding to the project.

---

8. The plaintiffs' requested relief, the permanent injunction of federal funding to the project, is an unorthodox remedy for the failure to file an environmental impact statement. The proper remedy is to enjoin funding until the agency follows procedures and observes the statute.

Ordinarily when an action is being undertaken in violation of NEPA, there is a presumption that injunctive relief should be granted against continuation of the action until the agency brings itself into compliance.

The fact that the present project is currently under construction by no means insulates it from the equity power of a court: "The substantial additional costs which would be caused by court-ordered delay" ... may well be justified by the compelling public interest in the enforcement of NEPA. *Realty Income Trust v. Eckard*, 564 F.2d 447, 456 (D.C.Cir.1977), *quoting Steubing v. Brinegar*, 511 F.2d 489, 497 (2d Cir. 1975).

However, the Ninth Circuit held in *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), that the failure to file an environmental impact statement is an injury in fact giving standing to all threatened with potential environmental injury from an agency's unresearched activities. At its broadest, *City of Davis* could be read to confer standing on all local residents suing under the National Environmental Policy Act to vindicate the deprivation of procedural rights, regardless of the progress in construction on a federal project, *cf. Richland Park Homeowners Association, Inc. v. Pierce*, 671 F.2d 935 (5th Cir. 1982), or the probability that the plaintiffs will actually suffer from an unidentified environmental injury.

In *City of Davis* the Ninth Circuit held that the Department of Transportation's failure to file an environmental impact statement gave a municipality standing to seek the injunction of funding on a partially constructed highway passing near the city. The court implicitly assumed that enjoining federal funding until an impact statement was filed could prevent the occurrence of serious yet undiscovered environmental damage. *City of Davis*, therefore, does not hold that failing to file an impact statement itself produces an injury in fact. The injury occurred with the creation of a risk that potential environmental damage would go undiscovered.

> The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient "injury in fact" to support standing, provided this injury is alleged by a plain-

tiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have. This is a broad test, but because the nature and scope of environmental consequences are often highly uncertain before study we think it an appropriate test.

521 F.2d at 671.

██ Unlike *City of Davis*, where construction on the highway was only halfway complete and a new environmental study could reveal unanticipated environmental effects from the projects, forcing HUD to reassess its participation in the project cannot achieve this result. The building is in the final stages of construction. The plaintiffs have not alleged the existence of the risk of a new environmental injury, whose appearance could be averted through a careful investigation of the environmental effects of the funding decision. While this is not a burden which plaintiffs suing under the National Environmental Policy Act normally bear, *id.*, it does not appear that if a risk of a new environmental injury was discovered, the injury could be avoided by withdrawing federal financial support to the project. Thus, requiring HUD to file an impact statement, an action which possibly could lead to withdrawal of federal assistance, will not benefit the plaintiffs. An impact statement is unlikely to reveal an additional risk beyond plaintiffs' alleged injuries. Since belatedly placing the plaintiffs' views before HUD will achieve no other noticeable benefit, this case is far different from *City of Davis*.[9]

---

**9.** Questions of standing occasionally carry a close resemblance to other justiciability doctrines. This issue has several similarities to the question of mootness. Both doctrines are founded on the case and controversy requirement in Article III and therefore both bear on the question of whether the plaintiff has a personal stake in the outcome of the lawsuit.

The "personal stake" aspect of the mootness doctrine also serves primarily the purpose of assuring that federal courts are presented with disputes they are capable of resolving. One commentator has defined mootness as "the doctrine of standing set in

a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973).

*United States Parole Commission v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). The parties argue, however, that the issue is one of standing rather than mootness because, with the Section 8 funding still unreleased, the district court could have logically and physically awarded the remedy prayed for in the complaint. Presumably,

 With their alleged injuries unable to be remedied, the only other interest the plaintiffs could plausibly assert is in the efficient and legal administration of a federal administrative agency. The plaintiffs share an interest with all other citizens in HUD's allocation of federal monies in compliance with federal law. However, this interest does not alone give the plaintiffs standing to sue. The Court recently stated:

> This Court repeatedly has rejected claims of standing predicated on " 'the right, possessed by every citizen, to require that the Government be administered according to law....' *Fairchild v. Hughes*, 258 U.S. 126, 129 [42 S.Ct. 274, 275, 66 L.Ed. 499] (1922)." *Baker v. Carr*, 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962). Such claims amount to little more than attempts "to employ a federal court as a forum in which to air ... generalized grievances about the conduct of government." *Flast v. Cohen*, 392 U.S. [83], at 106 [88 S.Ct. 1942 at 1956, 20 L.Ed.2d 947].

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, 102 S.Ct. 752, 764, 70 L.Ed.2d 700 (1982) (citations omitted). In *Valley Forge*, the Court held a citizens group challenging the donation of surplus federal lands to a religious college did not have standing to sue. The plaintiffs alleged only that their personal right that the government adhere to the Establishment Clause had been offended. The plaintiffs' right here to the allocation of federal funds in accordance with the law is indistinguishable. Both are attempts "to employ a federal court as a forum in which to air ... generalized grievances about the conduct of government," *id. (quoting Flast v. Cohen,*

392 U.S. 83, 106, 88 S.Ct. 1942 at 1956, 20 L.Ed.2d 947 (1968)), an action plainly forbidden by *Schlesinger*, 418 U.S. at 208, 94 S.Ct. at 2925 and *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974), and now reaffirmed by *Valley Forge.*

The standing doctrine in its constitutional sense represents the fundamental authority of the district court to adjudicate a controversy under Article III. Like questions of subject matter jurisdiction, questions of standing should be decided early in the lawsuit, lest the plaintiff's standing to sue dissolve, in some circumstances, into mootness, and deprive plaintiffs of a hearing on the merits of their complaint. *Cf. Sierra Club*, 405 U.S. at 756, 92 S.Ct. at 1376 (Blackmun, J., dissenting).

> Art. III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the framers of the Constitution at Philadelphia in 1787....

*Valley Forge,* —— U.S. at ——, 102 S.Ct. at 760. We can restore the plaintiffs' opportunity to adjudicate their claim only by holding this lawsuit still presents a case and controversy under Article III. It does not and we therefore cannot.

AFFIRMED.

CUDAHY, Circuit Judge, concurring:

I concur in both the result reached by Judge Wood and in his analysis, but I write

where the remedy is physically impossible for the district court to award, as in the case where the plaintiffs seek to enjoin construction of a building which is completed during the litigation, the doctrine of mootness applies. Here, however, the mootness doctrine may not apply because the plaintiffs sought only to enjoin funding, a remedy still arguably available because the Section 8 funds have not been released. *Cf. Richland Park Homeowners Association, Inc. v. Schweiker,* 671 F.2d 935 (5th Cir. 1982). We need not be concerned with

fine distinctions between the standing and mootness doctrines. At times the two are indistinguishable. *Warth,* 422 U.S. at 499 n.10, 95 S.Ct. at 2205 n.10. Rather, while this issue may well have been considered under the mootness doctrine, we have analyzed the question under standing principles because that was the basis of the district court's decision, the parties adopted that approach in their briefs and because *Geraghty* indicates analysis of this issue under the two doctrines would be identical.

separately to emphasize what seem to me to be the distressing implications of our decision. Our opinion notes the developers' statement in their petition to intervene that the building could not be constructed without federal assistance. But this statement, made soon after the lawsuit began, "is of little relevance to their present financial ability to withstand the withdrawal of federal assistance." *Ante*, at 1038. Thus, when building goes forward apace, absent preliminary injunctive relief and without a seasonable opportunity for consideration of the objections on the merits, the plaintiffs eventually lose their standing to be heard. This sort of outcome by presentation of a *fait accompli* is not calculated to nurture respect for procedures and other considerations mandated by law. We shall probably never know whether this housing project meets the applicable site and neighborhood standards or what its full environmental impact may be.

It is, of course, possible that the plaintiffs' objections are quite unmeritorious, but we can hardly assume that. And given such precedents as *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the plaintiffs ought not to have lost their day in court. I think the result we reach here underscores the significance of the irreparable harm criterion in evaluating the case for preliminary relief. And, because I believe that environmental considerations are of fundamental importance, I think it unfortunate that they can be effectively ignored when financing and building proceed so much more rapidly than the litigation challenging the project.