927 F.2d 1401
 59 USLW 2598
 Clint W. HARRIS and The Society of Separationists, Inc.,
Plaintiffs-Appellees,
v.
CITY OF ZION, LAKE COUNTY, ILLINOIS, Mayor of Zion and Zion
City Council, Defendants-Appellants.
Theodore M. KUHN and The Society of Separationists, Inc.,
Plaintiffs-Appellants,
v.
CITY OF ROLLING MEADOWS, Mayor of Rolling Meadows and
Rolling Meadows City Council, Defendants-Appellees.
 Nos. 90-1542, 90-1673.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1990.
Decided March 19, 1991.
 
 Richard M. Gutman, Carlisle, Pa., for plaintiffs-appellees.
 Roderick A. Palmore, Paul S. Chervin, Jane Z. Bohrer, Wildman, Harrold, Allen & Dixon, Charles F. Marino, Chicago, Ill., Berle L. Schwartz, Goble & Alexrod, Highland Park, Ill., Adeline J. Geo-Karis, Zion, Ill., for defendants-appellants.
 Darrell Dunham, Carbondale, Ill., for amicus curiae.
 Donald M. Rose, Kathleen Ross, Rose & Ross, Rolling Meadows, Ill., for defendants-appellees, Mayor of Rolling Meadows, Rolling Meadows City Council and City of Rolling Meadows.
 Before BAUER, Chief Judge, FLAUM and EASTERBROOK, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 In these two appeals, consolidated for decision in the district court, we are asked to determine whether the Establishment Clause of the first amendment prohibits the use of sectarian religious symbolism on a municipality's corporate seal. In both cases, we find that sectarian religious imagery simply has no place on municipal seals.
 
 
 2
 In Kuhn v. City of Rolling Meadows and Harris v. City of Zion, both at 729 F.Supp. 1242 (N.D.Ill.1990), the Society of Separationists ("Society") and two of its members, Theodore M. Kuhn and Clint W. Harris, filed suit against the cities of Rolling Meadows and Zion, respectively, as well as against their mayors and members of their city councils in their official capacities, under 42 U.S.C. Sec. 1983. Both suits seek declaratory and injunctive relief. The plaintiffs in each case claim that the seal of Rolling Meadows and the seal, emblem and logo of Zion violate the Establishment Clause of the first amendment because they contain Christian symbolism. All parties moved for summary judgment under Fed.R.Civ.P. 56.
 
 
 3
 The district judge drew a fine distinction between the two cases. In Kuhn, the district court found that, although the official seal of Rolling Meadows contains a Latin cross, it does not violate the first amendment. Thus, the court denied the plaintiffs' motion and later entered judgment for the City of Rolling Meadows. In Harris, however, the district court found that Zion's seal, emblem and logo do present constitutional violations. The court granted the plaintiffs' motion for summary judgment, enjoining Zion from further use of its current seal, emblem and logo. Theodore M. Kuhn and the Society (plaintiffs in Kuhn ) and the City of Zion (defendant in Harris ) appealed. Finding that both the seal of Rolling Meadows and the seal, emblem, and logo of Zion represent unconstitutional uses of religious imagery, we reverse the district court judgment in Kuhn, and affirm in Harris.[1]
 
 I. Background
 A. Rolling Meadows
 
 4
 Rolling Meadows adopted its current seal in 1960, in celebration of the City's fifth anniversary. The seal was designed as a school art assignment by Cheryl Knudsen, then an eighth grade student at the Salk School in Rolling Meadows.[2] Knudsen simply drew the things she saw in Rolling Meadows: inside her design of a four-leaf clover, she drew a tree in one section, a bird in another, a school in the third, and the new church being built in her neighborhood in the last section. The anniversary committee that presented the winning design to the City Council for approval altered Knudsen's design somewhat. The tree was changed to a leaf, and the bird was replaced by a water tower and two industrial buildings. The neighborhood church was retained. This final design was approved by the Rolling Meadows City Council in June 1960. (See Appendix A for Rolling Meadows seal.) The Rolling Meadows seal is displayed on all City-owned vehicles, including police patrol cars. The seal is also found on City letterhead, on the shoulder patches worn by uniformed members of the Rolling Meadows Police Department, on the residents' garbage sacks, on vehicle tax stickers, and in the City Council chambers.
 
 
 5
 Kuhn and the Society sued, objecting to the Latin cross (i.e. a cross whose base stem is longer than the other three arms) in the right quadrant of the Rolling Meadows seal. This cross stands prominently before a one story building--the church that was under construction in Cheryl Knudsen's neighborhood back in 1960. While the building depicted in the right quadrant of the seal is not obviously a church (its flat appearance could suggest another industrial building or a school), there is no doubt that the structure in front of the building is a Latin cross. There also can be no doubt that a Latin cross is the principal and unmistakable symbol of Christianity as practiced in this country today. See American Civil Liberties Union v. City of St. Charles, 794 F.2d 265, 267 (7th Cir.) (enjoining St. Charles' prominent display of a lighted Latin Cross as part of the municipality's annual Christmas display), cert. denied, 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986).
 
 
 6
 Kuhn and the Society claimed that the presence of the cross on the Rolling Meadows seal promotes or endorses Christianity and, thus, violates the first amendment which prohibits any law "respecting the establishment of religion." U.S. Const. amend. I. The district court found that, in the context of the Rolling Meadows seal, the relation between the cross and Christianity is weak. The court believed that the other images in the seal--specifically, the leaf, the industrial scene and the school--"neutralize" the sectarian impact of the cross and preclude any unconstitutional endorsement of Christianity. Kuhn, 729 F.Supp. at 1248. From this decision, Kuhn and the Society appealed.
 
 B. Zion
 
 7
 To understand the genesis and design of Zion's corporate seal, emblem and logo, we must consider the rather unique history of the City. In 1896, the Reverend John Alexander Dowie founded the Christian Catholic Church, an evangelical protestant sect that still flourishes today in a world-wide fellowship. Six years after the founding of the Church, Reverend Dowie established the City of Zion in Lake County, Illinois, in March 1902. The May 3, 1902 edition of "Leaves of Healing," the Church newsletter edited by Dowie, explains the reasons for which Zion was founded: "Zion City ... is being built for the purpose of the extension of the kingdom of God upon earth ... where God shall rule in every department of family, industry, commercial, educational, ecclesiastical and political life."
 
 
 8
 At the first meeting of the Zion City Council on May 6, 1902, Reverend Dowie, who had assumed the title "General Overseer of the Christian Catholic Church in Zion," presented the new City Council with a proposed corporate seal. This proposed seal consisted of a shield draped with a ribbon that reads "God Reigns" and encircled by the words "Corporate Seal" and "City of Zion, Illinois." The shield lies in the center of the seal and is divided into four sections. Each section contains a different symbol. The left section contains a Latin cross; the upper section contains a dove carrying a branch; the right section contains a sword and a crown; and the lower section contains the name "Zion." In presenting the proposed seal to the Zion City Council, Reverend Dowie urged:
 
 
 9
 I ask you to accept (this seal) and use it reverently. Let no hand ever hold this lever and put this seal to anything that God does not approve. Let the officer who uses this seal feel, as he pulls this lever and makes this impression, "God Reigns," that the document must be such a one as God approves.
 
 
 10
 May every commission of every officer which bears the seal of this City be looked upon as solemn thing; that it is a commission to bear such authority, however small or great, as God's minister--God's minister in law--God's minister in the Eternal Covenant in a measure.
 
 
 11
 Minutes of First Council Meeting, City of Zion, May 6, 1902. Reverend Dowie also explained the meaning of the symbols included in the seal:
 
 
 12
 Look at the Dove which is the emblem of the Holy Spirit, bearing the Message of Peace and Love over the seas. The Cross represents everything to us in Redemption, Salvation, Healing, Cleaning and Keeping Power. The Sword is the Sword of the Spirit, which is the Word of God. The Crown is the Crown of Glory, the Crown of Joy, the Crown of Righteousness, the Crown of Rejoicing.
 
 
 13
 Id.
 
 
 14
 The City Council unanimously approved Reverend Dowie's proposal, and his design has remained the corporate seal for the City of Zion until the present day.[3] (See Appendix B for the Zion seal.) The Zion City Council later designed the City's emblem and logo. The emblem is simply the central part of the seal, consisting of the shield with its four sections, and the ribbon that reads "God Reigns." The logo also is derived from the seal. The logo is circular and contains a large "Z." To the left of the "Z" lies a Latin cross; to the right of the "Z" lies the crown and the scepter; and above the "Z" flies the dove carrying the branch. (See Appendices C and D for the Zion emblem and logo.) The seal or emblem appears on the City flag, on the City letterhead, in the City Council chambers, on City vehicle stickers of all vehicles operated by Zion residents, and on the shoulder patches of City police officers and fire fighters. The logo appears on the Zion water tower and on City street signs.
 
 
 15
 The district court found that the images displayed on the Zion seal, emblem, and logo function as strong symbols of a particular sect of Christianity with nothing to "neutralize" the religious message. "The City of Zion's seal, emblem and logo have the effect of endorsing a Christian message. Nothing more is required to demonstrate a violation of the Establishment Clause." Harris v. City of Zion, 729 F.Supp. at 1250 (quoting County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 3105, 106 L.Ed.2d 472 (1989)). Thus, the district court granted the motion for summary judgment of Harris and the Society and permanently enjoined the display of Zion's seal, emblem or logo in their current forms. The City of Zion appealed.
 
 II. Discussion
 A. Standing
 
 16
 The first issue we must consider is whether the plaintiffs have standing to maintain this suit. Because Article III of the Constitution limits the "judicial power" of the United States to the resolution of "cases and controversies," the authority of federal courts "cannot be defined, and indeed has no substance, without reference to the necessity to adjudge the legal rights of litigants in actual controversies." Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1981) (quoting Liverpool S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)). See also Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1983). To have standing, the plaintiff must have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).
 
 
 17
 In order to establish a "personal stake" in the case, a plaintiff must show that he has suffered "some threatened or actual injury resulting from the putatively illegal action...." Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973)). See also Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166-67, 92 S.Ct. 1965, 1968-69, 32 L.Ed.2d 627 (1972); Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). That injury must be fairly traceable to the challenged action of the defendant, and it must be likely to be redressed by a favorable decision. Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758. The requirement that the plaintiff allege an "injury-in-fact," whether economic or non-economic, excludes simple indignation as a basis for Article III standing. That the plaintiffs may be offended by the defendants' conduct is not enough to confer standing. St. Charles, 794 F.2d at 268. See also Allen, 468 U.S. at 751, 104 S.Ct. at 3324 ("The injury alleged must be 'distinct and palpable,' and not 'abstract' or 'conjectural' or 'hypothetical.' ") (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) and Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1664-65, 75 L.Ed.2d 675 (1983)); People Organized for Welfare and Employment Rights v. Thompson, 727 F.2d 167, 171 (7th Cir.1984) ("The injury brought about by a violation of law must ... affect one's possessions or bodily integrity or freedom of action, ... and not just one's opinions, aspirations or ideology.") The federal courts simply are not constituted as "ombudsmen of the general welfare." Valley Forge, 454 U.S. at 487, 102 S.Ct. at 767.
 
 
 18
 With these general considerations in mind, we turn to the plaintiffs' claims. Because the Society alleges no injury to itself, its standing depends on that of its members: the individual plaintiffs Kuhn and Harris. Valley Forge Christian College, 454 U.S. at 476 n. 14, 102 S.Ct. at 761 n. 14; Warth, 422 U.S. at 511, 95 S.Ct. at 2211; St. Charles, 794 F.2d at 267. Kuhn and Harris each allege several direct burdens imposed on them by the presence of the religious symbols in the City seals.[4] Kuhn claims he is injured by the requirement that he display the Rolling Meadows seal, which is depicted in the municipality's vehicle tax sticker, on the windshield of his automobile; that he is likewise required to dispose his household refuse in garbage sacks that display the seal; and finally, that he "mightily strives to avoid any visual contact" with the Rolling Meadows seal by utilizing alternative travel routes. Harris alleges similar types of injury--that he is required to display on his automobile the Zion vehicle tax sticker which, like the Rolling Meadows sticker, contains the City's seal, and that he too "mightily strives" to avoid viewing Zion's seal, emblem or logo by altering his travel routes. Specifically, Harris alleges that he avoids the particular route that brings him within visual contact of Zion's water tower which exhibits the Zion logo. Following our decision in St. Charles, 794 F.2d 265 (concluding that the ACLU had standing to challenge the lighted cross in St. Charles' Christmas display), the district court held that both Kuhn and Harris alleged sufficient injury to confer standing on these plaintiffs. We agree.
 
 
 19
 Regardless of the overstated language of the complaints, the plaintiffs' alleged injuries, however slight, are indeed judicially cognizable. As the Supreme Court stated, "An identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." United States v. SCRAP, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1972) (quoting Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613 (1968)). The injuries claimed by Kuhn and Harris are little more than "identifiable trifles." As noted above, the fact that the plaintiffs may be offended by the seals of Rolling Meadows and Zion does not confer standing. It is the willingness of the plaintiffs to incur a tangible, albeit small cost that validates the existence of genuine distress and warrants the invocation of federal jurisdiction. St. Charles, 794 F.2d at 268. See also Saladin v. City of Milledgeville, 812 F.2d 687, 690-692 (11th Cir.1987) (appellants had standing to challenge the constitutionality of the Milledgeville seal which contained the word "Christianity" in the center of the seal).
 
 
 20
 For the purposes of standing, we need not consider if the plaintiffs can prove injury. It is enough that the plaintiffs Kuhn and Harris have pleaded good-faith allegations of damage that can be remedied by the federal courts. The test for standing, as for jurisdiction generally, is what the complaint alleges, not what the evidence shows. St. Charles, 794 F.2d at 269. "If a plaintiff merely fails to prove injury, his failure goes to damages (or in an equity case like this, to the right to obtain an injunction), rather than to jurisdiction." Id. That the allegations of a complaint may be sufficient to confer standing also is supported by South East Lake View Neighbors v. Department of Housing and Urban Development, 685 F.2d 1027, 1034 (7th Cir.1982), where this court declared:
 
 
 21
 A challenge to standing does not justify an inquiry into the strength of a complaint. Questions of standing deal exclusively with whether the plaintiff alleged facts satisfying the constitutional and prudential limitations of the doctrine. The ability of the complaint on its merits to survive a summary judgment motion or support an award in law or equity after a full trial is irrelevant.... Consequently, the district court considering a motion to dismiss for lack of standing accepts all material allegations in the complaint as true and liberally construes the document in favor of the plaintiff.
 
 
 22
 Id. at 1034 (citations omitted). Thus, Kuhn and Harris have sufficiently alleged a personal stake in this litigation to justify the exercise of the court's remedial powers on their behalf. The litigants, then, have standing to maintain these suits.
 
 
 23
 In his dissent, infra at 1419, Judge Easterbrook disagrees with our analysis. He doubts that Kuhn and Harris experience the sort of injury necessary for standing. Judge Easterbrook cites Lujan v. National Wildlife Federation, --- U.S. ----, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), to suggest that Kuhn and Harris may not sufficiently have "proved" their injuries. We disagree with this interpretation. Conferring standing upon Kuhn and Harris in no way conflicts with Lujan. On the contrary, Kuhn and Harris fully satisfy the logic of Lujan.
 
 
 24
 In Lujan, a national wildlife group challenged the entire "land withdrawal review program" of the Bureau of Land Management. This program determined the status of public land and its availability for private uses such as mining. The plaintiffs claimed a right to challenge the Bureau's decisions under Sec. 10(a) of the Administrative Procedure Act, 5 U.S.C. Sec. 702, which provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The Supreme Court determined that the plaintiffs did not satisfy Sec. 702's requirements for judicial review because they failed to identify an "agency action" within the meaning of Sec. 702. The court held that neither the allegations of the complaint nor the supporting affidavits "enable the respondents to challenge the entirety of the so-called 'land withdrawal review program.' " Id. The Supreme Court, then, denied standing because the plaintiffs failed to meet the statutory requirement that they be adversely affected or aggrieved by an agency action.
 
 
 25
 We note that in its discussion of standing, the Lujan Court focused on the allegations of the complaint and turned to the affidavits to search for any saving support. At no time did the Court state that well-pleaded allegations of the complaint, if they appropriately identified an "agency action," would not be sufficient to confer standing. See 110 S.Ct. at 3189-93. The failure of the plaintiffs--evident in both the complaints and affidavits--was that they sought "wholesale improvement of the [Bureau's] program by court decree, rather than in the offices of the Department [of the Interior] or the halls of Congress, where programmatic improvements are normally made." Id. at 3190.[5]
 
 
 26
 Thus, when the dissent suggests that, after Lujan, Kuhn and Harris "must do more than allege; in response to a motion for summary judgment, they must produce affidavits showing the essential kind of injury," it blurs the distinction between the allegations sufficient to confer standing and the evidence necessary to support a motion for summary judgment. As to the former, our above review of the plaintiffs' well-pleaded allegations makes clear that Kuhn and Harris have adequately alleged palpable injuries. But as to the latter, we need consider further both the governing law and the record to assess the dissent's argument that Kuhn and Harris have not sufficiently proved their allegations of injury. Such an examination leads us to conclude that the claims of Kuhn and Harris do not suffer from a failure of proof.
 
 Rule 56(e) states:
 
 27
 When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
 
 
 28
 Fed.R.Civ.P. 56(e). These two sentences were added in 1963 to overcome the line of cases, chiefly in the Third Circuit, which had impaired the utility of the summary judgment device by permitting the adverse party to rest on the pleadings, which on their face may present a genuine issue for trial. Rule 56 requires, then, that the adverse party present some evidence to block a grant of summary judgment for the movant. See Notes of Advisory Committee on Rules, Fed.R.Civ.P. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("[Rule 56] requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (quotations omitted).
 
 
 29
 A close examination of the record demonstrates the correctness of the district court's finding that no material facts were in dispute, making summary judgment an appropriate resolution of these cases. The Cities of Rolling Meadows and Zion simply failed to challenge the factual allegations of injury that Kuhn and Harris declared in their affidavits. For instance, in its answer to Kuhn's motion for summary judgment, Rolling Meadows neglected to oppose Kuhn's statements that he seeks to avoid contact with the Rolling Meadows seal and that the City would not collect his personal refuse because he refused to place the garbage in the official bag that depicts the objectionable seal. Instead, the city argued that the seal does not endorse religion. To that end, Rolling Meadows submitted affidavits from several individuals to demonstrate the absence of any sectarian endorsement.[6] By its failure to challenge the declarations of injury in Kuhn's affidavit, the City of Rolling Meadows accepted those statements as true, and waived any claim that Kuhn's allegations of injury present a triable issue.
 
 
 30
 Similarly, in Harris, the City of Zion also failed to challenge Harris's declarations of injury contained in his affidavit. Harris stated that he avoids certain routes that bring him within visual contact of the Zion seal. Nowhere does the City challenge these averments. Thus, like Rolling Meadows, Zion must be deemed to have accepted these declarations; therefore, there is no genuine issue of fact suitable for trial concerning Harris's injuries. As Fed.R.Civ.P. 56(e) and Celotex instruct us, one of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. 477 U.S. at 324, 106 S.Ct. at 2553. The district court correctly employed the mechanism of summary judgment in determining that Kuhn and Harris provided sufficient, uncontested allegations of injury.[7]
 
 
 31
 The dissent also employs a touch of hyperbole to add vigor to its arguments. When discussing why the Harris case "looks like a put-up job," the dissent compares Harris's claims of injury with the allegations in St. Charles and Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir.1990). The dissent describes how the plaintiffs in those earlier cases were compelled by religious scruples "to change the pattern of their lives." For Harris, the seal is only "an attractive nuisance, not an irritant compelling changes of the sort we discussed in St. Charles and Crestwood." Infra at 1420. But what, in fact, were the injuries in St. Charles and Crestwood that so outweigh the injuries of Kuhn and Harris? In St. Charles, the plaintiffs argued that "they were so offended by the lighted cross that they departed from their accustomed routes of travel to avoid seeing it." 794 F.2d at 267. Such an injury was sufficient to confer standing on that plaintiff. (We note that the objectionable government exhibit in St. Charles, the lighted cross on top of the firehouse, was displayed only at Christmas time for, at most, five weeks per year.) In Crestwood, the injury that provided standing was simply that John Doe, a resident of the Village of Crestwood, could not enjoy the use of a beer garden for a few hours one afternoon each year. 917 F.2d at 1478. Hardly the kind of injury that would lead to a change in the very pattern of one's life.
 
 
 32
 Kuhn and Harris at least endure as much of an injury as did the plaintiffs in St. Charles and Crestwood. If anything, Kuhn and Harris probably suffer an even greater degree of distress due to the fact that the seals of Rolling Meadows and Zion are displayed year-round, throughout the cities, causing these plaintiffs to alter permanently their behavior. Cf. Friedman v. Board of County Commissioners of Bernalillo County, 781 F.2d 777, 782 (10th Cir.1985) (Comparing the challenged seal of Bernalillo County to the creche display in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Tenth Circuit noted, "The seal, unlike the creche, pervades the daily lives of county residents; [the creche] is displayed once a year for a brief period on a single parcel of government land. [The seal] appears on all county paper work, on all county vehicles, even on county sheriff's uniforms."). Kuhn and Harris even offer claims of injury that did not exist in St. Charles. Kuhn alleges (and the City of Rolling Meadows admits) that he is required to dispose of his refuse in garbage bags that depict the seal. Both Kuhn and Harris allege (and both cities admit) that they are required to display their Cities' tax sticker, which contains the challenged seals, on their car windshields.[8]
 
 
 33
 The dissent also argues that conferring standing on Kuhn and Harris represents a departure from circuit precedent, citing Judge Flaum's opinion in Freedom from Religion Foundation, Inc. v. Zielke, 845 F.2d 1463 (7th Cir.1988). We disagree. On the contrary, Zielke provides additional support for our analysis and holding in the instant cases. Zielke supports the proposition that well-pleaded allegations of palpable injury will satisfy the standing requirement. The reason that the plaintiffs in Zielke failed to obtain standing was not due to a "failure of proof." Instead, the Zielke plaintiffs failed to satisfy the standing requirement because they were unable to allege any true injury. In Zielke, this court declared:
 
 
 34
 Provided a litigant alleges the existence of a distinct and palpable injury, even a minor injury can satisfy the case or controversy requirement of Article III.... [The plaintiffs] allege that the display [of a monument depicting the Ten Commandments in a public park] is a rebuke to their religious beliefs and that they are offended by its presence; but they admit that they have not altered their behavior as a result of the monument. The psychological harm that results from witnessing conduct with which one disagrees, however, is not sufficient to confer standing on a litigant.
 
 
 35
 845 F.2d at 1467 (citations omitted). Zielke supports conferring standing upon Kuhn and Harris. The Zielke plaintiffs never argued that they changed their behavior, as Kuhn and Harris have stated in both their complaints and affidavits.
 
 
 36
 Behind this exposition of the case law "lies the practical recognition that if the injury, tenuous though it be, suffered by the involuntary audience for a display alleged to constitute an establishment of religion does not confer standing to sue, there will be no judicial remedy against establishments of religion that do not depend on public funds." St. Charles, 794 F.2d at 268. This "practical recognition" in no way suggests that Kuhn and Harris have not satisfied the legal standards necessary for standing. Instead, this notion only points out that if Kuhn and Harris are not permitted to sue, then there is simply no way to test the constitutionality of the city seals.
 
 B. The Establishment Clause
 
 37
 We turn now to the merits of these appeals. Because there were no material issues in dispute, the district court appropriately resolved these cases on summary judgment. It remains for us to correct the district court's reluctance to apply the full breadth of Establishment Clause freedoms and to reiterate our commitment to an energetic first amendment.
 
 
 38
 The first amendment provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. It is generally accepted that the framers had two purposes in mind when they drafted the above quoted language: "to prevent the establishment of a national church, and to forbid a national preference of one Christian sect over another." American Jewish Congress v. City of Chicago, 827 F.2d 120, 123 (7th Cir.1987) (holding that the placement of a nativity scene in Chicago's City Hall fostered an identification of the City with Christianity, thus violating the Establishment Clause).
 
 
 39
 Perhaps originally the Religion Clauses merely sought to protect the diversity of faiths and practices within Christianity itself. Thus, Joseph Story could fairly write that "the real object of the [first] amendment was, not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment, which should give to a hierarchy the exclusive patronage of the national government." 2 J. Story, Commentaries on the Constitution of the United States Sec. 1877 at 594 (1851) (quoted in Wallace v. Jaffree, 472 U.S. 38, 52 n. 36, 105 S.Ct. 2479, 2487 n. 36, 86 L.Ed.2d 29 (1985)). See also American Jewish Congress, 827 F.2d at 123-24. But when the principles of religious freedom and tolerance were examined "in the crucible of litigation," the Supreme Court "unambiguously concluded that ... the first amendment embraces the right to select any religious faith or none at all." Wallace, 472 U.S. at 52-53, 105 S.Ct. at 2487-88.
 
 
 40
 In addition to the individual's complete freedom of conscience, "[t]he Religion Clauses also have come to stand for the principle of governmental neutrality, meaning not only that government should not favor one religion over another, but also that government should not favor religion over nonreligion." American Jewish Congress, 827 F.2d at 124. With the incorporation of first amendment freedoms into the Due Process Clause of the fourteenth amendment,[9] "[t]he modern Supreme Court has treated the establishment clause as a directive to the courts to strike down all public acts, federal, state, and local, whose primary purpose or predominant effect is to promote one religious group at the expense of others or even promote religion as a whole at the expense of the nonreligious, a position that treats even the nonreligious simply as another sect." St. Charles, 794 F.2d at 270.
 
 
 41
 Needless to say, determining if a given public act promotes a particular religious sect (including, as we have said, the sect of nonbelievers) is no easy task. Yet, in this delicate area of constitutional adjudication, we are reminded that the first amendment does not merely prohibit the establishment of a state church or a state religion; instead, it demands that there should be no law even respecting the establishment of religion. A given law or governmental practice might not establish a state religion but nevertheless be one "respecting" such a religion, and hence offend the first amendment. See Lemon v. Kurtzman, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (holding that the statutory programs of Rhode Island and Pennsylvania that provide state aid to church-related elementary and secondary schools are unconstitutional). At the same time, "it has never been thought possible or even desirable to enforce a regime of total separation between religion and government." Committee for Public Education v. Nyquist, 413 U.S. 756, 760, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973). As a consequence, cases arising under the Religion Clauses of the first amendment have presented some of the most perplexing questions in constitutional law. Id. Our task, then, is to assess the seals of Rolling Meadows and Zion in light of these constitutional principles.
 
 
 42
 To determine if the challenged government conduct does indeed offend the constitution, we rely upon the now familiar three-prong test that was first annunciated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105 and recently reconfirmed in County of Allegheny v. American Civil Liberties Union, 109 S.Ct. 3086.[10] If a statute or practice that touches upon religion is to be permissible under the Establishment Clause, then 1) it must have a secular purpose (i.e. its purpose must not be to advance particular religious beliefs); 2) it must neither advance nor inhibit religion in its principal or primary effect; and 3) it must not foster an excessive entanglement with religion. County of Allegheny, 109 S.Ct. at 3100; Lemon, 403 U.S. at 612-613, 91 S.Ct. at 2111. The challenged practice or statute--here the corporate seal of Rolling Meadows and the seal, emblem and logo of Zion--must pass each of these tests to be found constitutional.
 
 1. Rolling Meadows
 
 43
 The district court correctly limited the examination of the constitutionality of the Rolling Meadows seal to the second prong of Lemon; the seal neither evinces an illegitimate purpose nor fosters any religious entanglement. Thus, the "effects" element forms the critical inquiry of this appeal.
 
 
 44
 Briefly, as to the first Lemon element, it is clear that Cheryl Knudsen, the school girl who essentially designed the seal, acted with no unconstitutional purpose in mind. Knudsen simply drew what she saw as she observed her growing community. And in adopting Knudsen's design in celebration of the City's fifth anniversary, Rolling Meadows did not abandon its fundamental neutrality. See American Jewish Congress, 827 F.2d at 126. The City Council adopted the child's entry in order to provide the City with a pleasing design for its seal. There is no evidence to suggest that the city sought to encourage religion in general or Christianity in particular with the adoption and use of the seal. That the City needed an official Rolling Meadows seal to identify city property and correspondence is without question. Thus, the secular purpose element of the Lemon analysis is satisfied, as the City's intent in adopting the seal was neither to advance nor inhibit religious practice. See Edwards v. Aguillard, 482 U.S. 578, 585, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987). See also Lynch v. Donnelly, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).
 
 
 45
 Similarly, the Rolling Meadows seal creates no entanglement with religion. The fact that the seal happens to depict a church in Ms. Knudsen's neighborhood, the Community Church of Rolling Meadows, does not necessarily entangle the city's business with the mission of the depicted church. There is no evidence in the record to suggest that the Community Church ever intruded into the affairs of the City or that the City ever participated in the policies or operations of the Community Church. Thus, the third prong of the Lemon test is also satisfied.
 
 
 46
 The second, "effects" element of Lemon, however, is not so easily met. The aim of the "effects" or endorsement element is to prevent "government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred.... Whether the word is endorsement, favoritism, or promotion, the essential principle remains the same: the Establishment Clause prevents the government from appearing to take a position on questions of religious belief." County of Allegheny, 109 S.Ct. at 3101 (quotation omitted). See also Edwards, 482 U.S. at 593, 107 S.Ct. at 2583 ("Because the primary purpose of the Creationism Act is to advance a particular religious belief, the Act endorses religion in violation of the first amendment.").
 
 
 47
 In County of Allegheny, the Supreme Court found that a Christmas nativity scene displayed on the Grand Staircase of the Allegheny County Courthouse endorsed a patently Christian message, thus violating the Establishment Clause. By displaying the creche on the most prominent part of the seat of county government, the county sent an unmistakable message that it supported and promoted Christian praise to God. 109 S.Ct. at 3104. In the same way, the obvious presence of a Latin cross on the corporate seal of Rolling Meadows also endorses or promotes a particular religious faith. It expresses an unambiguous choice in favor of Christianity. It presents to any observer a clear endorsement of all those beliefs associated with a Latin cross in violation of the Establishment Clause of the first amendment.
 
 
 48
 Like the seat of county government in County of Allegheny, or the City Hall Building in American Jewish Congress, the corporate seal of a municipality is "plainly under government control ... (and is) a clear symbol of government power." American Jewish Congress, 827 F.2d at 128. In fact, the Rolling Meadows seal presents a more compelling case for finding the challenged display unconstitutional. The City's seal is a permanent statement that is viewed year-round, while the creche is displayed only seasonally amidst the secular celebration of Christmas. The Latin cross on the seal, then, brings together church and state in a manner that suggests their alliance perhaps even more ardently than the unconstitutional creche displays in County of Allegheny or American Jewish Congress. The seal of Rolling Meadows acts as the City's imprimatur for official correspondence, property and business. The conspicuous depiction of the pre-eminent symbol of a particular faith on that seal conveys a message of approval that is simply inconsistent with the first amendment.
 
 
 49
 Relying on the presence of other images on the seal, the district court found that "the relation of the challenged image before us, in the context we receive it, to ... religion, or more specifically Christianity, is weak.... The remaining pictures sufficiently neutralize the seal to avoid any religious message a lone or prominent cross would convey." Kuhn v. Rolling Meadows, 729 F.Supp. at 1248. Although we agree that the context surrounding the challenged image is crucial,[11] we do not agree that the particular context in this case--the other images on the seal--save the cross on the seal from an unconstitutional endorsement of Christianity. The images on the seal are not just neutral snapshots of the community; they are charged with endorsement. The City tries to hide behind the fact that a young girl essentially designed the seal with no attempt to endorse a particular faith. Yet, regardless of its origins, the Rolling Meadows seal does promote the selected images it depicts. To any observer, the Rolling Meadows seal expresses the City's approval of those four pictures of City life--its flora, its schools, its industry and commercial life, and its Christianity.[12]
 
 
 50
 It is this last expression of approval--Rolling Meadows' endorsement of Christianity--that simply cannot withstand constitutional scrutiny. The City argues that the cross on the seal invokes Christianity no more than conventional public acknowledgements of religion that continue to pervade American culture, such as the slogan "In God We Trust" on U.S. currency. See, e.g., Lynch, 465 U.S. at 675, 104 S.Ct. at 1360 ("Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders."). Yet, in the line-drawing process that erects a "blurred, indistinct, and variable barrier" between legitimate invocations of the deity and unconstitutional infringements, we have found that "the more sectarian the display, the closer it is to the original targets of the Establishment Clause, so the more strictly the clause is applied." St. Charles, 794 F.2d at 271. See also Lemon, 403 U.S. at 614, 91 S.Ct. at 2112. The Latin cross on the Rolling Meadows seal is surely a sectarian display. As such, we hold that it endorses Christianity in violation of the first amendment.
 
 2. Zion
 
 51
 In Harris v. City of Zion, the district court found that Zion's seal, emblem and logo violates the "effects" or endorsement element of the Lemon test. 729 F.Supp. at 1250. The district court suggested that the Zion seal, emblem and logo might also violate the "purpose" element as well. Id. at 1249-50. We agree with the district court's analysis. First, the purpose for the adoption of Zion's unique seal was primarily sectarian. In its adoption of its seal, Zion abandoned fundamental neutrality and acted with the intent to advance a particular religious viewpoint. See American Jewish Congress, 827 F.2d at 126 (quoting Corporation of Presiding Bishop v. Amos, 483 U.S. 327, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987)). Second, the seal, emblem, and logo continue to endorse and promote that sect of Christianity that founded the city and designed the seal in clear violation of the first amendment.[13]
 
 
 52
 As to the first point, Zion argues that, no matter what the original City Council's purpose in adopting the seal in 1902, the current City Council voted to retain the seal strictly for historical purposes. The City maintains that because the City Council has the authority to modify the seal at any time, the fact that the Council chose to retain the seal for valid reasons provides a new, wholly secular purpose to the seal's adoption. Thus, the City argues, Reverend Dowie's glowing explanation of the seal's religious significance is no longer relevant. The City relies on our statement in American Jewish Congress that the original purpose of Chicago's 1959 creche display does not form the purpose of a similar display in 1985. See American Jewish Congress, 827 F.2d at 126 (quoting Mayor Daley's 1959 comment on the Chicago nativity scene,[14] and concluding that, "although perhaps relevant to the original purpose of the nativity scene, [Mayor Daley's comment] reveals little about the purpose behind the 1985-86 display.").
 
 
 53
 The district court distinguished Zion's seal from the Chicago nativity scene by noting that the creche must be erected and dismantled each Christmas season, a practice that requires a new purpose every year. The Zion seal, on the other hand, was adopted by one legislative decision on May 6, 1902, and has remained essentially unaltered. Nevertheless, the City points to a May 20, 1986 resolution in which the Council voted to retain the seal for historical reasons. The 1986 resolution, the City argues, is the true expression of purpose for the Zion seal. We are not persuaded. "While the court is normally deferential to a state's [or municipality's] articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham." Edwards, 482 U.S. at 586-87, 107 S.Ct. at 2579. See also Wallace, 472 U.S. at 64, 105 S.Ct. at 2493 (Powell, J., concurring); id. at 75, 105 S.Ct. at 2499 (O'Connor, J., concurring in judgment). The minutes from the May 20, 1986 Council meeting offer, at best, meager evidence to demonstrate that the decision to retain the current seal was prompted by a desire to honor Zion's history. With such explicit religious design behind the seal's original adoption in 1902, something more than a perfunctory appeal to history is required to legitimatize the underlying purpose of this particular seal.
 
 
 54
 Even if we accept the 1986 resolution as an "historical" revision of purpose, the Zion symbols constitute an unconstitutional endorsement of Christianity, specifically, the Christian Catholic sect that still flourishes in Zion. The Zion seal presents the quintessential violation of the "long-standing constitutional principle that government may not engage in a practice that has the effect of promoting or endorsing religious beliefs." County of Allegheny, 109 S.Ct. at 3115. The City argues that the symbols in the seal--the shield, the sword or scepter, and the dove--do not convey a religious message. The City maintains that to the average resident who is not aware of Zion's history, the shield connotes achievement, the sword or scepter represents power or authority, and the dove suggests peace. The City concedes, however, that the Latin cross is singularly religious.
 
 
 55
 We are not convinced. It may be true that each symbol (with the exception of the cross), if taken individually, possesses several meanings, some religious and some secular. But when all the symbols, including the cross, are depicted in a single design under a flowing ribbon which reads "God Reigns," there is no question that the message conveyed is not only religious, but also sectarian.[15] The cross, shield, sword, scepter, dove, and crown are perhaps the most dominant and recurring images of Christianity. Depicting these patently religious symbols on a corporate seal that is wholly owned and controlled by the City connotes the City's approval for the message conveyed. See American Jewish Congress, 827 F.2d at 128 ("Because City Hall is so plainly under government ownership and control, every display and activity in the building is implicitly marked with the stamp of government approval.") With its Christian imagery, therefore, Zion's corporate seal, emblem, and logo inevitably create an unmistakable impression that the local government tacitly endorses Christianity.
 
 
 56
 Perhaps Zion's strongest argument lies in its claim that its seal, emblem and logo merely commemorate the historical origins of the City and, thus, convey no unconstitutional endorsement. The seal does not advance religion, Zion maintains, but only celebrates the City's roots. This argument is buttressed by the fact that the City of Zion can indeed boast a unique history, which this court respects. This religious heritage may deserve commemoration. Nevertheless, the City may not honor its history by retaining the blatantly sectarian seal, emblem, and logo. These symbols transcend mere commemoration, and effectively endorse or promote the Christian faith.
 
 
 57
 In Friedman, the only other case on record that involves a seal containing a Latin cross, the Tenth Circuit held that the county's seal violated the Establishment Clause because its depiction of a golden cross under the Spanish motto, "CON ESTA VENCEMOS" ("With This We Conquer"), clearly endorsed Christianity as its principal or primary effect. The Tenth Circuit enjoined the county's use of the challenged seal even though the religious imagery in the seal was said to commemorate the role of the Catholic Church in the settlement of the Southwest. See 781 F.2d at 779. The City of Zion seeks to distinguish its corporate seal from the seal of Bernalillo County by noting that the Latin cross in the Zion seal is smaller and shares space on the seal with a crown, a scepter and a dove. We find this argument a baseless attempt at distinction. Instead, we choose to follow the fundamental reasoning of the Tenth Circuit: "If the challenged practice is likely to be interpreted as advancing religion, it has an impermissible effect and violates the Constitution, regardless of whether it actually is intended to do so." Id. at 781.
 
 
 58
 Zion's seal, emblem, and logo do indeed endorse Christianity. As the district court found, nothing within the four corners of Zion's seal, emblem or logo detracts from their sectarian message. No appeal to history can abate that message when the images in the seal are abstract symbols of a particular Christian sect. The Establishment Clause, at the very least, "prohibits government from appearing to take a position on questions of religious belief." County of Allegheny, 109 S.Ct. at 3101. The resulting endorsement of religion need not be material or tangible; an implicit symbolic benefit is enough. Friedman, 781 F.2d at 781 (construing Larkin v. Grendel's Den, 459 U.S. 116, 125, 103 S.Ct. 505, 511, 74 L.Ed.2d 297 (1982)). Thus, Zion's use of its current seal, emblem, and logo must be discontinued due to their unconstitutional endorsement of Christianity.
 
 III. Conclusion
 
 59
 We hold that the corporate seal of the City of Rolling Meadows and the seal, emblem and logo of the City of Zion represent unconstitutional endorsements of a particular religious faith. Accordingly, we affirm the district court's judgment in Harris v. Zion, and reverse in Kuhn v. City of Rolling Meadows. Thus, both cities are permanently enjoined from continued use of their seals (and in Zion's case, its emblem and logo as well) in their present unconstitutional forms.
 
 
 60
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 61
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 62
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 63
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 EASTERBROOK, Circuit Judge, dissenting.
 Applying Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to religious symbols on city seals is no cakewalk. Lemon 's "three-part test" is not a test. It is a triad of questions, the answers to which conflict in all interesting cases. Conflict is what makes a case worth litigating. How to resolve conflicts? It is easy to list things to inquire about and hard to establish weights that produce outcomes congruent with the Constitution. Lemon does the former but not the latter. You need an understanding of the religion clauses, not a list of factors, to resolve tough cases such as ours. Before giving a constitutional opinion, however, we should be sure that there is a case or controversy. I have my doubts, and it is on this ground that the majority and I part company.
 
 
 *
 Plaintiffs say that they must go out of their way to avoid seeing religious symbols. This sort of allegation we deemed sufficient in ACLU v. City of St. Charles, 794 F.2d 265, 267-69 (7th Cir.1986), and Doe v. Village of Crestwood, 917 F.2d 1476, 1478 (7th Cir.1990). Standing sometimes depends on an "identifiable trifle". Claims about detours are about as trifling as one can produce. They sidle up against the line drawn by Valley Forge Christian College v. Americans United For Separation of Church and State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), which holds that offense taken at the government's complicity in religion does not create standing. Cf. Allen v. Wright, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). If offense is not enough, why is a detour attributable to that offense enough? The answer cannot be, as my colleagues say, that the willingness to take a detour "validates the existence of genuine distress" (927 F.2d at 1406); Valley Forge tells us that dismay does not establish standing, and therefore new and better ways to prove its existence cannot create standing. St. Charles holds instead that the detour narrows the class of plaintiffs and scope of dispute. If that is its function then we must ensure, when the plaintiffs' claims are challenged, that they have changed their daily constitutionals, that we are indeed dealing with injured rather than ideological plaintiffs. Both cities contested the plaintiffs' claims, yet the district court decided the cases without resolving these disputes
 My colleagues say that in determining standing to sue the allegations of the complaint must be taken as gospel. Some language in St. Charles looks in this direction, distinguishing the allegations needed to establish standing from the proof needed to prevail, 794 F.2d at 269, but the defendants there conceded the plaintiff's detour. These cities do not concede that the plaintiffs have rearranged their daily routines to avoid exposure to religious symbols. Quite the contrary, Zion contends that Harris moved in precisely because of the imagery in its seal. Harris related during his deposition that he had been recruited by the Society of Separationists as a potential plaintiff (apparently none of the existing residents of the city objected to the seal). He moved to a boarding house within the city's limits and lent his name to the litigation. This looks like a put-up job, distinct from the claim in St. Charles and Crestwood that long-time residents had been compelled by religious scruples to change the patterns of their lives. Harris has not incurred a "tangible, albeit small cost that validates the existence of genuine distress" (927 F.2d at 1406); he has incurred a tangible cost to expose himself to the seal. For Harris the seal is an attractive nuisance, not an irritant compelling changes of the sort we discussed in St. Charles and Crestwood. At the end of the day, what matters is that St. Charles recognized that the plaintiff could not prevail without proving the "detour" allegations of the complaint. 794 F.2d at 269. Today's opinion dispenses with that requirement.
 Ought we render constitutional judgment on the theory that federal courts are bound to accept whatever the scrivener put in the complaint? Then parties could confer jurisdiction on a court by consent, and collusive litigation would burgeon. Impositions on federal courts could flourish: one citizen of Illinois could sue another under the diversity jurisdiction by alleging that he is a citizen of Indiana, and despite the defendant's protests the court would not examine the veracity of the allegation. Yet courts do examine the jurisdictional allegations of complaints--that is what 28 U.S.C. Sec. 1359 and Fed.R.Civ.P. 12(b)(1), among other tools, are for.
 Lujan v. National Wildlife Federation, --- U.S. ----, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), furnishes an example. The D.C. Circuit allowed an inference of standing from the general allegations of the complaint, despite a challenge by the defendants and an inability of the plaintiffs to substantiate their allegations with proof. The Supreme Court reversed, holding that plaintiffs must do more than allege; in response to a motion for summary judgment, they must produce affidavits showing the essential kind of injury. So it should be in our cases. So it has been in the past in this circuit. Plaintiffs in Freedom from Religion Foundation, Inc. v. Zielke, 845 F.2d 1463 (7th Cir.1988), contended that a monument displaying the Ten Commandments violated the establishment clause. Most of the plaintiffs said that they took offense; we deemed this insufficient under Valley Forge. One of their number, Phyllis Grams, alleged that she lived nearby. This, too, we held insufficient:
 Although Grams lives in the City of La Crosse, the appellants did not demonstrate that she lives anywhere near Cameron Park, that the monument is visible in the course of her normal routine, or that her usual driving or walking routes take her past the park. The appellants also failed to establish that Grams suffered any injury simply because of her close proximity to the ... allegedly unconstitutional display. We therefore conclude that Grams cannot establish Article III standing simply on the basis of her alleged but unproven proximity to the offending conduct.
 845 F.2d at 1469. If Phyllis Grams had to prove her claims when challenged, why not Clint Harris and Theodore Kuhn? See also O'Hair v. White, 675 F.2d 680, 696 & n. 35 (5th Cir.1982) (in banc) (plaintiff must prove the factual allegations used to establish standing); Citizens Concerned for Separation of Church and State v. Denver, 628 F.2d 1289, 1298 (10th Cir.1980). A requirement of proof is essential to avoid unnecessary constitutional adjudication, and I do not see why we should go out of our way (take a detour?) to undermine that safeguard.
 Doubtless there is a sense in which failure of proof does not abolish standing. A plaintiff suing a driver who, he says, ran him down in the street, loses outright if the evidence shows that the injury was suffered falling down stairs at home; we do not retroactively dismiss for want of standing. It is easy to marshal cases for this proposition; the majority does so, citing not only St. Charles but also South East Lake View Neighbors v. Department of Housing and Urban Development, 685 F.2d 1027, 1034 (7th Cir.1982). Little beyond nomenclature is at stake, because both of these cases recognize that the plaintiff must prove the allegations in order to prevail, just as Lujan held. See also Crawford v. United States, 796 F.2d 924, 928-29 (7th Cir.1986).
 Failure of proof is not the only problem. I doubt that the allegations establish standing even if they can be proved. The cities put their seals on vehicle stickers, garbage bags, public buildings and cars, and public documents. Plaintiffs object to all of these, but most of these uses do not lead to an alteration in conduct. Harris's complaint, for example, protests the appearance of the seal on mail Zion sends him. But he does not allege that these symbols lead him to alter his conduct in any fashion. So too with the seal on the stickers that demonstrate payment of the vehicle tax: Harris contends that he avoids looking at the sticker, but this is hardly a detrimental alteration in conduct; drivers are supposed to look at the road ahead of them, not at tax stickers. Even this tiny inconvenience could be eliminated. Someone with a simple self-help remedy for his problem suffers no "injury in fact" and is not entitled to a judicial remedy that adversely affects the interests of his neighbors who may like the seals. Plaintiffs have such a remedy. Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), allows plaintiffs to cut out or cover up the objectionable portions of the seals. Drivers may not be conscripted as billboards for ideas of which they disapprove. So too with the imprinting of seals on the garbage bags Rolling Meadows supplies. If it tried to stop Kuhn from using bags without seals he would have standing--but only to claim his right under Wooley to edit the bags. For all we can tell, the city has no objection to redaction. Counsel for Kuhn said at oral argument that Rolling Meadows does not pick up garbage from bags that do not bear the seal. But the record does not reveal whether this is because of the absence of the seal or because the substitute bags were the wrong size or material. Silence on questions of this nature is not a firm basis for reaching a difficult constitutional question. At all events, our plaintiffs lack standing to stop other persons from having or using the seals. Could Maynard have obtained an injunction blocking New Hampshire from putting "Live Free or Die" on any license plates? I doubt it.
 The public seals (e.g., on the water tower in Zion) give the best case for standing, because residents then may say: "I take a longer route to avoid viewing that seal." There are two problems. First, despite what the majority says, Kuhn does not allege that he goes out of his way to avoid public displays of the seal. His affidavit omits any such assertion, contending instead that he is embarrassed by the seal, and that he does not enter public buildings where it appears. (Would he have used these buildings in the absence of the seal?) Second, allegations of this kind, if proven, challenge only the display of the seal in a particular place, not its composition. St. Charles allowed the plaintiff to object to a particular, visible cross; we did not say that because the city erected a 35-foot, lighted cross in public, the plaintiff could obtain an order forbidding, say, a crucifix on the mayor's desk. The constitutional injury could be eliminated by taking down the cross; here any injury could be eliminated by removing the seals from the water tower and other public places.
 Knowing that someone, somewhere, is using a seal with a cross yields purely abstract injury, a demand that the first amendment be enforced for its own sake. Under Valley Forge neither Harris nor Kuhn has standing to challenge internal use, any more than they would have standing to challenge an icon in the mayor's office, or a creche being stored in the basement of city hall. Even if they had standing, they could not prevail on the merits. Bowen v. Roy, 476 U.S. 693, 699-701, 106 S.Ct. 2147, 2152-53, 90 L.Ed.2d 735 (1986). Perhaps one could say that they have "standing" once they come across a single seal but that the relief should be limited to getting the seals out of the public eye, but this would be a detail. What matters is that they have asked for--and the majority gives them--relief more extensive than that necessary to eliminate their injuries. Call it standing, call it redressability, call it (following Roy ) the limited scope of permissible relief on the merits, the point is the same. They have at most an entitlement to the obliteration of the symbols that cause detours; any more extensive relief is unwarranted. We should dismiss the complaints to the extent they challenge anything other than placements that lead to inconvenient detours, and remand the residue with instructions to put plaintiffs to their proof.
 My colleagues' unwillingness to do this stems in part from their belief that if the plaintiffs lack standing, then "there is simply no way to test the constitutionality of the city seals" (927 F.2d at 1409). This misunderstands two things: my position, and the Constitution. I do not say that the plaintiffs lack standing utterly; I contend, rather, that the district court should determine whether the plaintiffs' factual assertions are true. If these plaintiffs cannot prove their allegations, perhaps some other residents of Zion and Rolling Meadows could. One who says that he was run down by a truck must prove it, and the demand for proof no more obliterates tort litigation than my position would wipe out establishment clause litigation. But if it did, so what? Article III of the Constitution limits judicial power to cases and controversies. If because no one is injured there is no controversy, then the Constitution demands that the court dismiss the suit. There is no exception for subjects that as a result cannot be raised at all. " 'The assumption that if [plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing.' Schlesinger v. Reservists Committee to Stop the War, 418 U.S. [208,] 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 [ (1984) ]. This view would convert standing into a requirement that must be observed only when satisfied." Valley Forge, 454 U.S. at 489, 102 S.Ct. at 767. Constitutional decisions may be necessary in the course of deciding real cases. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Courts do not create cases so that they will have the opportunity to render constitutional decisions. Adjudication is a byproduct of a real controversy, and not the other way around. If there is no case, then there is no occasion for deciding a constitutional question, and we should not mourn or struggle against this allocation of governmental powers. Hewitt v. Helms, 482 U.S. 755, 761-62, 107 S.Ct. 2672, 2676-77, 96 L.Ed.2d 654 (1987); Alliance to End Repression v. Chicago, 820 F.2d 873, 876 (1987).
 II
 
 
 I
 comment briefly on the merits because we may not be the final decision-makers
 The establishment clause of the first amendment, as I understand it, forbids taxation and coercion in support of religion but does not forbid the display of religious symbols. Allegheny County v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 3134-46, 106 L.Ed.2d 472 (1989) (Kennedy, J., dissenting); American Jewish Congress v. Chicago, 827 F.2d 120, 128-40 (7th Cir.1987) (Easterbrook, J., dissenting). I omit the line of argument that produces this conclusion and refer readers to my earlier opinion and Justice Kennedy's (which Chief Justice Rehnquist and Justices White and Scalia joined). Religious imagery on city seals does not raise taxes (seals with crosses are no more costly to produce than seals using other symbols) or penalize non-observance. The Constitution distinguishes threats from shadows. Zion's seal has been in use for 89 years without stifling religious diversity or slowing the conversion of a religious enclave to a secular city. Not one resident of Zion other than Harris has expressed concern. Instead of driving non-believers away, the seal attracted Harris to it.
 Perhaps a seal could penalize non-belief by striking fear into the hearts of viewers. See Friedman v. Board of County Commissioners, 781 F.2d 777 (10th Cir.1985) (in banc). "Con esta vencemos", Bernalillo County's slogan, was one the Jesuits used when burning heretics. When the police cars bearing it toured a predominantly Indian population, which had been mistreated by the Christians, there was reason to fear that the "Christian police" were at hand, perhaps with the Grand Inquisitor in tow. 781 F.2d at 779. Zion's seal carries no such message to an objective (or any other) observer, and Rolling Meadows' is pallid.
 Justice Kennedy's views did not prevail in Allegheny. Three justices (Brennan, Marshall, & Stevens, JJ.) took a strict separatist position, and two (Blackmun & O'Connor, JJ.) reached the conclusion that a local government may use religious symbols if it does not "endorse" religion. 109 S.Ct. at 3100-01. That two-justice position, the most narrow offered in support of the judgment, is the "holding" of Allegheny. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). Any legal position rejected by seven justices is shaky at best, and we cannot be confident that it will survive. Stability has not been a notable feature of establishment clause jurisprudence. No one should be surprised if the view held by four justices, one with deeper historical roots, see AJC, 827 F.2d at 135-37, eventually obtains a majority.
 Applying the two-justice "no endorsement" view to city seals produces nothing but headaches. What is endorsement in a world pervaded by religious imagery, from the eye in the Great Seal of the United States (the eye of God in a pyramid representing the Christian Trinity) to "In God We Trust" on the coinage to Thanksgiving Day (to Whom are thanks being given?) to the religious stamps the Postal Service issues at Christmas and Easter to the names of our cities (Los Angeles, San Francisco, Corpus Christi) and submarines (the same list; there is even a "Los Angeles class" of submarines)? See Aronow v. United States, 432 F.2d 242 (9th Cir.1970); O'Hair v. Murray, 588 F.2d 1144 (5th Cir.1979). Did the United States endorse a particular religion when putting "Corpus Christi" on a submarine? But perhaps the name's significance has been forgotten, or is overlooked in daily use. Why not say the same about the imagery on seals?
 Does the city "endorse" everything on its seals? The majority answers yes and on this ground gives judgment for the plaintiffs. But Justices Blackmun and O'Connor did not cleave to such a view. Allegheny involved religious symbols on public property. The justices could have said that a city necessarily endorses whatever appears in its halls. Had they done this, the Court would have held unconstitutional the placement of a huge menorah in front of Pittsburgh's city hall. Yet the Court sustained the placement, because a nearby Christmas tree withdrew any implication that the city endorsed Judaism. Should one not say the same thing for at least the Rolling Meadows seal, in which the cross is surrounded by secular symbols, including a leaf, a school, and a water tower? The majority's riposte--whatever the city prints, it endorses--is inconsistent with the views of six justices in Allegheny.
 Cases such as ours show some of Lemon 's problems. The majority immediately throws away one "prong" of its test for both cases, and a second tine ("purpose") sloughs off for Rolling Meadows. Everything collapses to the no-endorsement rule, one more compelling if divorced from the three-part test (or as advanced thinkers call it these days, "tri-partite inquiry"). Why use three parts when only one matters?
 
 
 A
 majority of the Court has reached this conclusion, making our reference to Lemon outdated. The four dissenting justices in Allegheny withheld support, 109 S.Ct. at 3134, and Justice O'Connor, who provided the essential fifth vote for the majority, did so without relying on Lemon, a case of which she has been critical. Aguilar v. Felton, 473 U.S. 402, 426-30, 105 S.Ct. 3232, 3245-47, 87 L.Ed.2d 290 (1985) (O'Connor, J., dissenting). Thus only four justices relied on Lemon in Allegheny. Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the Court's other recent case dealing with religious symbols, also bypasses the Lemon "tests". We should take this cue and do likewise
 To see why Lemon has lost its tang one need look no further that the majority's application of its purpose prong. My colleagues say that Zion's seal violates the first amendment because it was designed by Rev. Dowie and adopted by the city council in 1902 to carry out the religious mission of the Christian Catholic Church. Indeed so; Zion was founded as a religious utopian community, and the Theocratic Party governed for more than two generations. In 1902 no one would have given this a second thought: the speech clause of the first amendment was not applied to the states until Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and the religion clauses were not extended to the states for another 27 years. Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). Given our commitment to cultural and religious diversity, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the establishment of religious communities is unexceptionable. Many of this Nation's founders sought to establish religiously identifiable communities, and their value has been shown recently by the Mormons, who needed separate communities to survive hostility to their beliefs, and by the Amish, whose way of life is tightly integrated with their religious beliefs. The purpose behind Zion's creation--of which its seal is only an incidental part--does not count against it.
 Why should a purpose to promote religion ever condemn an act of government? Often it does not: all of the accommodation-of-religion cases flunk this purpose inquiry, yet many accommodation rules are sustained and, when doing this, the Court ignores Lemon. Michael W. McConnell, Accommodation of Religion, 1985 Sup.Ct.Rev. 1. Other laws have religious purposes (e.g., the Sunday closing laws) but are sustained because they also have secular purposes.
 Suppose Zion originally built schools because Rev. Dowie said they made for better missionaries. Would the schools in Zion have to be torn down? Fra Angelica painted to glorify the Roman Catholic Church; do we doubt that the display of his paintings in the National Gallery has a secular purpose? Why would the purpose of maintaining the seal in Zion be different? If there is something wrong with the seal, how about the city's name? This, too, was picked for a religious purpose and conveys a religious message--more potent than the seal. Must the city change its name?
 The majority allows that a genuine change of heart can cleanse the improper motive. Yet why has not Zion had a change of heart? Are we looking into the heads of the members of the city council who voted in 1986 to retain the seal for (they assert) historical reasons? The Theocratic Party lost power in Zion more than 40 years ago and is defunct. So far as the record shows, not one member of Zion's city council belongs to the Christian Catholic Church or owes office to constituents who support that faith. Before declaring that the current purpose of the seal is religious, we would need a trial that has not yet occurred. Zion can't lose a motive question on an empty record. (There were fat records in Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987), and Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).)
 So we should bypass Lemon as Justice O'Connor did in Allegheny and ask her question directly: would an objective observer view these seals as endorsements of Christianity? Whether the observer would have this reaction gives me more trouble than it does the majority. The imagery in Zion's seal is overwhelming, but the historical context may prevent an informed observer from inferring contemporary endorsement. As for Rolling Meadows: its seal is not powerfully Christian. The object of everyone's attention looks more like a telephone pole than a cross; its arms are too short to crucify anyone. The original plaintiff dropped out because he came to conclude that the symbol is a utility pole in front of an industrial building. We know, from the affidavit of the artist, that it was meant to be a cross, but an objective observer lacks this knowledge. I do not think we can say, as the majority does (927 F.2d at 1403), that it is "no doubt" a cross. It is "obviously" a cross only after you know the genesis of the seal, which is to say that to the outside observer it is not obviously a cross. It is enough, however, that Rolling Meadows concedes that an observer would take this as a cross, and we ought to accept the concession rather than treat the debatable as obvious.
 How, then, are we to carry out the tasks set for us by Justices Blackmun and O'Connor? There is no straightforward way--perhaps no way, period--to do so. Which may indicate that we have been sent on a wild goose chase, that the proper answer lies along the path of the separatists (Justices Brennan, Marshall, and Stevens) or along the path marked by Justice Kennedy. The best I can do is to predict that Justices Blackmun and O'Connor would condemn the use of any religious imagery not nestled in a secular context. What kind of context? We discussed the subject in Crestwood, 917 F.2d at 1478-79:
 Two contexts mattered--first the season, for in each case [Allegheny and its predecessor Lynch ] the government was displaying the symbols appropriate to the time of year; second the immediately surrounding symbols, for in each case the government was displaying an assortment of symbols appropriate to all aspects of the holidays. Christmas and Hanukkah are secular as well as religious holidays; to use symbols appropriate to all aspects of the occasion is not to endorse a particular religion. Mather v. Village of Mundelein, 864 F.2d 1291 (7th Cir.1989). If Christmas may be a secular holiday, the state may recognize whose birthday is being commemorated.
 Zion's symbols do not have a secular context of any sort. Rolling Meadows is not trying to put the cross in a seasonal context and is not displaying all of the symbols for an occasion. It selected a few, which are unrelated except by being within the borders of the city. Governance is not a "context" that drains the significance of a religious image.
 So long as the two-justice position in Allegheny rules, we must condemn these seals (if we reach the merits). This approach avoids the need to apply judicial aesthetic judgment, or perhaps recur to the gestalt psychologists. I don't know how to determine what observers think, if they think at all about these seals. Line drawing in this area will be erratic and heavily influenced by the personal views of the judges. We ought to use bright line rules, and Allegheny (while it lasts) admits of this one.
 
 
 [1]
 With no material issues of fact in dispute, the district court ruled on the motions for summary judgment as a matter of law. It is well-settled that whether a government display violates the first amendment is indeed a question of law. See Mather v. Village of Mundelein, 864 F.2d 1291, 1292 (7th Cir.1989); American Jewish Congress v. City of Chicago, 827 F.2d 120, 123 (majority opinion), 129-30 (7th Cir.1987) (J. Easterbrook, dissenting). Thus, on review we examine the issues de novo with "no deference to the district court's resolution." Mather, 864 F.2d at 1292
 
 
 [2]
 There is some dispute in the record concerning the school that Knudsen attended and her grade in that school when she designed the seal. As the district court properly found, these facts are irrelevant, having no bearing on the larger issues in the appeal. Resolution of such disputes is therefore unnecessary
 
 
 [3]
 The sword in the right section of the shield was later changed to a scepter. This is the only variation in Zion's present seal from Reverend Dowie's original design
 
 
 [4]
 Although Kuhn and Harris allege that they are taxpayers, they do not claim injury from any expenditure of tax revenues by either city to display or maintain the seals. Thus, their status as taxpayers is irrelevant. See St. Charles, 794 F.2d at 267
 
 
 [5]
 Even if Lujan somehow is read to stand for the dissent's proposition that the plaintiffs must be "put to their proof," the instant cases are clearly distinguishable from Lujan. Lujan involved judicial review of an administrative action; standing to challenge such an action was determined by statutory interpretation. In Kuhn and Harris, we must grapple with the meaning and implication of the first amendment. Standing for Establishment Clause claims should be determined primarily by applying the well-settled law from prior Establishment Clause cases, not by applying an ill-suited analysis from an inapposite case
 
 
 [6]
 Specifically, Rolling Meadows submitted the affidavits of Cheryl Knudsen Keifer, the school girl who designed the seal, Phil Prete, a 1960 alderman of the city who participated in the seal's adoption, William Ahrens, a Rolling Meadows public official who declares that the seal's purpose is not to establish religion, and James Muldowney, an engineer who measured the actual space that the image of the cross occupies on the seal
 
 
 [7]
 In developing its argument that Kuhn and Harris have failed in their proofs, the dissent mischaracterizes the record. For example, the dissent states: "[D]espite what the majority says, Kuhn does not allege that he goes out of his way to avoid public displays of the seal. His affidavit omits any such assertion, contending instead that he is embarrassed by the seal, and he does not enter public buildings where it appears." See infra at 1421-22 (emphasis in original). These statements are not accurate. First, as we have described, Kuhn alleged specifically in his complaint (which is, of course, the primary focus of the standing inquiry) that "he will often avoid using the route to the downtown area of Rolling Meadows ... where the seal of the City of Rolling Meadows is most prominently displayed." See Third Amended Complaint, para. 8. Second, in his affidavit submitted in support of his motion for summary judgment, Kuhn states: "In order to avoid seeing the Rolling Meadows seal, I avoid public offices of the City of Rolling Meadows such as the City Hall and the Public Works Building." See Affidavit of Theodore M. Kuhn, para. 5. As we discuss above, the city never challenged this statement of injury. Nowhere in his affidavit does Kuhn state that he is "embarrassed" by the seal
 
 
 [8]
 The dissent claims that the effect of Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), ought to be addressed. We fail to see how Wooley applies to this case. There are simply no facts in the record to indicate that Kuhn and Harris ever tried to cover up their vehicle tax stickers, or how Rolling Meadows and Zion would react if they attempted to do so. We can only speculate--or we could deny standing because Kuhn and Harris did not cover up or cut out the objectionable part of their stickers and thereby incur criminal liability, as did the plaintiffs in Wooley. Either of these approaches is misguided; there are sufficient allegations in the complaints to confer standing on Kuhn and Harris
 
 
 [9]
 See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) ("The fundamental concept of liberty embodied in [the fourteenth amendment] embraces the liberties guaranteed by the first amendment. The first amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The fourteenth amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws.")
 
 
 [10]
 The dissent expends considerable effort counting justices and speculating on the future of Establishment Clause jurisprudence in order to suggest that the holding of County of Allegheny is "shaky at best." Infra at 1423. We submit that the fact that County of Allegheny was a 5-4 decision, and that one of the members of the majority has since left the court, is not relevant; County of Allegheny is still the law of the land, and should be followed by intermediate federal courts of appeals unless and until we are given contrary direction from the Supreme Court
 
 
 [11]
 County of Allegheny makes clear that the constitutionality of a religious display will often depend upon its context. "The government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context." 109 S.Ct. at 3103
 
 
 [12]
 The Supreme Court has determined that, when evaluating the government's use of religious symbolism, the court must consider observers of the symbolism to include both adherents and nonadherents. "[A]n important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval of their individual religious choices." Grand Rapids School District v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). Because the cross in the Rolling Meadows seal endorses Christianity, by implication it also expresses disapproval for divergent religious opinions
 
 
 [13]
 Because we hold that the Zion seal, emblem and logo violate the second element of the Lemon analysis, nothing more is required to demonstrate a violation of the Establishment Clause. County of Allegheny, 109 S.Ct. at 3105. Yet, because the history and purpose of the Zion seal is so much a part of this appeal, and because of the inherent delicacy of first amendment adjudication, we discuss the import of the first, "secular purpose" element of Lemon as well
 
 
 [14]
 Mayor Daley (the First) said of the nativity scene: "We are a Christian nation. I think the more religion we can get in politics, the better off we are." American Jewish Congress, 827 F.2d at 126
 
 
 [15]
 Again, we note that, when examining Zion's use of Christian symbolism in its corporate seal, we must consider the likely perceptions of both adherents and nonadherents of the challenged religious imagery. See supra at note 12. With this broad, objective standard, the court must evaluate the overall impact of the seal, emblem and logo. See Friedman v. Board of County Commissioners of Bernalillo County, 781 F.2d 777, 781 (10th Cir.1985) ("The existence of a non-secular effect is to be judged by an objective standard, which looks only to the reaction of the average receiver of the government communication or the average observer of the government action."). Thus, as the district court found on Zion's motion for reconsideration, the fact that the City's mayor does not believe that the seal conveys a religious message or that the 1600 residents who signed a petition do not feel that the seal denotes discrimination is barely relevant, and clearly non-probative. The key issue in this case is not the mayor's views or even discrimination. The question to be resolved solely involves the primary purpose and predominant effect of Zion's seal, emblem and logo. We find that purpose and effect to violate the first amendment